# EXHIBIT A

In the Superior Court of the State of Arizona

# CV2017-013928

**CIVIL COVER SHEET- NEW FILING ONLY**
(Please Type or Print)

Is Interpreter Needed? ☐ Yes ☑ No
If yes, what language: _____

MICHAEL K. JEANES, CLERK
BY R. Mallard
DEP
R. MALLARD, FILED
17 OCT 30  PM 1:50

To the best of my knowledge, all information is true and correct.

_____
**Attorney/Pro Per Signature**
(If no attorney, YOUR signature)

Plaintiff's Attorney  Gregory Collins, Seth Goertz

Attorney Bar Number  023158, 031645

Plaintiff's Name(s): (List all)
Joseph Giron

Mission Medical Services, Inc.

Plaintiff's Address:
c/o Kercsmar & Feltus PLLC

7150 E. Camelback Road, Suite 285

Scottsdale, Arizona 85251

(List additional plaintiffs on page two and/or attach a separate sheet).

Defendant's Name(s): (List All)   Springboard, Inc., Springboard Health Group LLC, and Gavin Hays

(List additional defendants on page two and/or attach a separate sheet)

EMERGENCY ORDER SOUGHT:  ☐ Temporary Restraining Order   ☐ Provisional Remedy   ☐ OSC
☐ Election Challenge   ☐ Employer Sanction   ☐ Other _____
(Specify)

☐ RULE 8(i) COMPLEX LITIGATION APPLIES. Rule 8(i) of the Rules of Civil Procedure defines a "Complex Case" as civil actions that require continuous judicial management. A typical case involves a large number of witnesses, a substantial amount of documentary evidence, and a large number of separately represented parties.

(Mark appropriate box on page two as to complexity, **in addition** to the Nature of Action case category.)

☐ THIS CASE IS ELIGIBLE FOR THE COMMERCIAL COURT UNDER RULE 8.1. Rule 8.1 defines a commercial case and establishes eligibility criteria for the commercial court. Generally, a commercial case primarily involves issues arising from a business contract or business transaction. However, consumer transactions are not eligible. A consumer transaction is one that is primarily for personal, family or household purposes. **Please review Rule 8.1 for a complete list of the criteria.** See http://www.superiorcourt.maricopa.gov/commercial-court/. You must check this box if this is an eligible commercial case. **In addition, mark the appropriate box below in the "Nature of Action" case category.** The words "commercial court assignment requested" must appear in the caption of the original complaint.

## NATURE OF ACTION

(Place an "X" next to the **one** case category that most accurately describes your primary case.)

**100 TORT MOTOR VEHICLE:**
☐ 101 Non-Death/Personal Injury
☐ 102 Property Damage
☐ 103 Wrongful Death

**110 TORT NON-MOTOR VEHICLE:**
☐ 111 Negligence
☐ 112 Product Liability – Asbestos
☐ 112 Product Liability – Tobacco
☐ 112 Product Liability – Toxic/Other
☐ 113 Intentional Tort
☐ 114 Property Damage

☐ 115 Legal Malpractice
☐ 115 Malpractice – Other professional
☐ 117 Premises Liability
☐ 118 Slander/Libel/Defamation
☐ 116 Other (Specify) _____

**120 MEDICAL MALPRACTICE:**
☐ 121 Physician M.D.   ☐ 123 Hospital
☐ 122 Physician D.O.   ☐ 124 Other

Case No._____

## 130 CONTRACTS:

- ☐ 131 Account (Open or Stated)
- ☐ 132 Promissory Note
- ☐ 133 Foreclosure
- ☐ 138 Buyer-Plaintiff
- ☐ 139 Fraud
- ☒ 134 Other Contract (i.e. Breach of Contract)
- ☐ 135 Excess Proceeds-Sale
- ☐ Construction Defects (Residential/Commercial)
  - ☐ 136 Six to Nineteen Structures
  - ☐ 137 Twenty or More Structures

## 150-199 OTHER CIVIL CASE TYPES:

- ☐ 156 Eminent Domain/Condemnation
- ☐ 151 Eviction Actions (Forcible and Special Detainers)
- ☐ 152 Change of Name
- ☐ 153 Transcript of Judgment
- ☐ 154 Foreign Judgment
- ☐ 158 Quiet Title
- ☐ 160 Forfeiture
- ☐ 175 Election Challenge
- ☐ 179 NCC-Employer Sanction Action
  (A.R.S. §23-212)
- ☐ 180 Injunction against Workplace Harassment
- ☐ 181 Injunction against Harassment
- ☐ 182 Civil Penalty
- ☐ 186 Water Rights (Not General Stream Adjudication)
- ☐ 187 Real Property
- ☐ Sexually Violent Person (A.R.S. §36-3704)
  (Except Maricopa County)
- ☐ Minor Abortion (See Juvenile in Maricopa County)
- ☐ Special Action against Lower Courts
  (See lower court appeal cover sheet in Maricopa)
- ☐ 194 Immigration Enforcement Challenge
  (§§1-501, 1-502, 11-1051)

## 150-199 UNCLASSIFIED CIVIL:

- ☐ Administrative Review
  (See lower court appeal cover sheet in Maricopa)
- ☐ 150 Tax Appeal
  (All other tax matters must be filed in the AZ Tax Court)
- ☐ 155 Declaratory Judgment
- ☐ 157 Habeas Corpus
- ☐ 184 Landlord Tenant Dispute- Other
- ☐ 159 Restoration of Civil Rights (Federal)
- ☐ 159 Clearance of Records (A.R.S. §13-4051)
- ☐ 190 Declaration of Factual Innocence
  (A.R.S. §12-771)
- ☐ 191 Declaration of Factual Improper Party Status
- ☐ 193 Vulnerable Adult (A.R.S. §46-451)
- ☐ 165 Tribal Judgment
- ☐ 167 Structured Settlement (A.R.S. §12-2901)
- ☐ 169 Attorney Conservatorships (State Bar)
- ☐ 170 Unauthorized Practice of Law (State Bar)
- ☐ 171 Out-of-State Deposition for Foreign Jurisdiction
- ☐ 172 Secure Attendance of Prisoner
- ☐ 173 Assurance of Discontinuance
- ☐ 174 In-State Deposition for Foreign Jurisdiction
- ☐ 176 Eminent Domain– Light Rail Only
- ☐ 177 Interpleader– Automobile Only
- ☐ 178 Delayed Birth Certificate (A.R.S. §36-333.03)
- ☐ 183 Employment Dispute- Discrimination
- ☐ 185 Employment Dispute-Other
- ☐ 195(a) Amendment of Marriage License
- ☐ 195(b) Amendment of Birth Certificate
- ☐ 163 Other _____
  (Specify)

## COMPLEXITY OF THE CASE

If you marked the box on page one indicating that Complex Litigation applies, place an "X" in the box of no less than one of the following:

- ☐ Antitrust/Trade Regulation
- ☐ Construction Defect with many parties or structures
- ☐ Mass Tort
- ☐ Securities Litigation with many parties
- ☐ Environmental Toxic Tort with many parties
- ☐ Class Action Claims
- ☐ Insurance Coverage Claims arising from the above-listed case types
- ☐ A Complex Case as defined by Rule 8(i) ARCP

**Additional Plaintiff(s)**

_____

_____

**Additional Defendant(s)**

_____

_____

MICHAEL K. JEANES
Clerk of the Superior Court
By Rebecca Mallard, Deputy
Date 10/30/2017 Time 16:54:49
Description                          Amount
--------- CASE# CV2017-013928 ---------
CIVIL NEW COMPLAINT                  322.00
-----------------------------------------
TOTAL AMOUNT                         322.00
       Receipt# 26234467

1

2

3

Gregory B. Collins (#023158)
Seth T. Goertz (#031645)
KERCSMAR & FELTUS PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
Telephone: (480) 421-1001
Facsimile:  (480) 421-1002
gbc@kflawaz.com
stg@kflawaz.com

4

5

6

7

*Attorneys for Plaintiffs Joseph A. Giron and
Mission Medical Services, Inc.*

8

9        **IN THE SUPERIOR COURT FOR THE STATE OF ARIZONA**

10            **IN AND FOR THE COUNTY OF MARICOPA**

11

12

JOSEPH A GIRON, a married man;
MISSION MEDICAL SERVICES, INC., a
California corporation,

Case No.   CV2017-013928

13                    Plaintiffs,

**COMPLAINT**

14   v.

15

16

17

SPRINGBOARD, INC, an Arizona
corporation;     SPRINGBOARD
HEALTHCARE    GROUP,   LLC  and
GAVIN HAYS, an unmarried man,

**(Breach of Contract, Breach of Implied
Covenant of Good Faith and Fair
Dealing,   Declaratory   Judgment,
Material Misrepresentation under §
10(b) of Securities Exchange Act and
SEC   Rule   10b-5,   Quantum
Meruit/Unjust Enrichment)**

18                    Defendants.

19

20

21

22

Plaintiffs Joseph A. Giron and Mission Medical Services, Inc., set forth the
following as their Complaint against Defendants Springboard, Inc., Springboard
Healthcare Group, LLC and Gavin Hays:

23                    **SUMMARY OF ACTION**

24

25

26

27

28

1.     We've all heard this story before: start-up company develops a big idea;
start-up looks for a strategic partner (a larger company to scale-up the big idea); larger
company promises the start-up will be treated as an equal; big idea turns into big money;
and … we all know what happens next.  Big company, here Defendant Springboard, Inc.
("Springboard") and its CEO, Gavin Hays ("Hays"), reneg on their promise to make start-

*Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001*

up, here Plaintiff Mission Medical Services, Inc. and its President Joseph A. Giron (together, "Giron"), their partner. The big idea is a medical training methodology called EP Savant. EP Savant has been a true revelation in the medical community. It has received acclaim from the Duke University Health System and the projected five-year profitability for this program is $100,000,000.00. Springboard and Hays now claim EP Savant for themselves.

2.      Aware of the instructional methodology's obvious potential, early on Springboard and Hays offered to "partner" with Giron. But now that EP Savant is fully developed and highly profitable, Springboard has entirely withheld the compensation it agreed to pay Giron (in two signed agreements) for his partnership, and Springboard, via Hays, has transferred EP Savant to Defendant Springboard Healthcare Group, LLC (the "Springboard LLC"), which is wholly owned by Hays.

3.      Through this lawsuit, Giron simply wants what he is owed. As explained below, in exchange for Mission Medical, Inc.'s staffing company and Giron's hundred-million dollar concept, Giron's written signed agreements with Springboard entitle Giron to a ten percent ownership interest in Springboard, ten percent of the EP Savant-related revenue going forward and certain already earned bonuses. This unpaid, earned, compensation totals over $30,000,000.00.

4.      Alternatively, if somehow Springboard is correct here and it actually does not owe Giron anything, then Giron is an even bigger winner. This is because the agreements that Giron signed with Springboard purport to transfer to Springboard the intellectual property related to EP Savant in exchange for roughly $30,000,000.00. But if Springboard does not actually pay these monies, then neither Springboard nor the LLC owns the intellectual property related to EP Savant; Giron does.

5.      As explained further below, Giron brings claims against Springboard for breach of contract (Counts I-II) to enforce Giron's contracts with Springboard. Giron also brings a claim for breach of the implied covenant of good faith and fair dealing against Springboard (Counts III) related to the same contracts. Next, Giron brings claims for

Kersmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

declaratory judgment in the alternative (Count IV), requesting that--if the Court finds the contracts at issue unenforceable--it declare that Giron owns the intellectual property created under those contracts, including EP Savant. Additionally, Giron brings a claim against Hays for material misrepresentations relating to the sale of securities (*i.e.*, the stock options which Hays promised Giron but failed to grant) under the Securities Exchange Act § 10(b) and S.E.C. Rule 10b-5 (Count V). And finally, in an abundance of caution, Giron brings one final alternative claim (Count VI): asserting a claim in quantum meruit that requests that, if the signed contracts are void (and they are not), the Court award Giron the value of his services to Springboard.

## PARTIES AND JURISDICTION

6.     Plaintiff Joseph A. Giron is a California resident.

7.     Plaintiff Mission Medical Services, Inc. is a California corporation.

8.     Defendant Springboard, Inc. is an Arizona corporation authorized to do business and doing business in Arizona.

9.     Defendant Springboard Healthcare Group, LLC, is an Arizona limited liability company.

10.     Defendant Gavin Hays is an Arizona resident.

11.     This Court has jurisdiction over the subject matter of this action pursuant to A.R.S. § 12-123 and Article 6, Section 14 of the Arizona Constitution.

12.     Venue is proper in this Court under A.R.S. § 12-401.

## GENERAL ALLEGATIONS

I.     **After building a successful staffing agency, Giron creates EP Savant**

13.     Giron received formal training as a radiology technologist at Loma Linda University. Giron also received formal training as a registered nurse at Excelsior College, graduating in 2005. He practiced radiological, nursing, and cardiovascular sciences in the cardiac catheterization and electrophysiological labs at White Memorial Medical Center, St. Jude Medical Center, Riverside Medical Center and Stanford University Medical Center from 1998-2012.

Keesmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

3

14.     During his time working as a cardiovascular specialist, Giron discovered a need for medical staffing agency focused on cardiac services.

15.     In 2005, Giron founded Mission Medical Services, Inc. ("Mission").

16.     By 2010, Mission had grown in size and was experiencing considerable success.  As a result, larger staffing agencies began to inquire about potential partnership opportunities.  One such agency was WestWays Staffing, LLC ("WestWays"), which Giron agreed to join as a franchisee.

17.     While operating his staffing agency through WestWays, Giron continued his education in medical training procedures through Loma Linda University and Stanford University.

18.     At Stanford, Giron conceived of a revolutionary method for training medical staff in cardiac catheterization and electrophysiology ("EP") labs, which could also be extended to other medical disciplines.

19.     When Apple released its "iBook Author" program Giron instantly recognized that it was the ideal starter platform to deliver and convey complex training content via iPads in the medical field.  iBook Author allowed Giron to develop a prototype that could later expanded to an online delivery or mobile app format.  Using iBook Author, Giron began work on a prototype, which eventually became "EP Savant."

20.     In 2012 and 2013, Giron began displaying the EP Savant concept to various prospective partners.  Of course, Giron required potential partners to sign a non-disclosure agreement ("NDA") prior to viewing the concept.

21.     In December 2013, Duke University Medical Center ("Duke") contacted Giron about the possibility of developing the EP Savant concept for Duke's cardiac electrophysiology lab.  Giron viewed this as a great opportunity, but realized that in order to engage Duke, he would need a partner to support his staffing business so that he could devote proper time to EP Savant: enter Springboard and Hays.

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

4

## II.   In order to develop EP Savant, Giron partners with Springboard

22.   Although his partnership with WestWays had been successful, Giron did not believe that WestWays had the capacity, or interest, to maintain the growth of his staffing agency or to support EP Savant's development.

23.   In search for a suitable partner, Giron was introduced to Hays in late 2013. At one of their initial meetings, Giron displayed the EP Savant concept to Hays, but only after Hays signed a NDA.   Hays was immediately impressed with EP Savant and proposed a potential partnership with Springboard.

24.   Giron considered Springboard to be a worthwhile partner because it was already a large medical services and staffing company.  In addition, Hays was quick to recognize the value of EP Savant, and pledged that Springboard would support Giron's efforts to develop it.

25.   Accordingly, in April 2014, Hays sent Giron a letter agreement ("Letter Agreement") outlining the terms of a potential deal.  *See* April 2014 Letter Agreement, attached as Exhibit 1.

26.   Under the Letter Agreement, Springboard proposed structuring the deal in two phases.  The first phase of the deal ("Phase I") involved Giron ending his agreement with WestWays and merging his staffing agency into Springboard.  As part of this "merger," Giron would also be joined by fellow WestWays franchisee, Tom Harmon, owner of Apex Medical Staffing, LLC ("Apex").

27.   The Letter Agreement provided that Giron and Harmon would split seventy-five percent of Springboard's profit, with Hays to retain the remaining twenty-five percent.  In addition, the Letter Agreement provided that both Giron and Harmon would each receive "5% [ ] undiluted shares of [Springboard] vested after 15 months [of] providing 3.5M [revenue] achieved within 15 months."

28.   The second phase of the deal ("Phase II") as proposed in the Letter Agreement would involve Giron transitioning to a new role with Springboard .  The Letter Agreement provided that Giron would be paid a salary from Springboard, plus an

Kersmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

additional 5% in Springboard stock, for "a total 10% holding [for] each combined Phase I & II."

29.    Giron was amenable to the Letter and Agreement.  In July 2014, he began Phase I of the relationship with Springboard, transferring his staffing agency and entering into a Services Agreement ("Services Agreement").  *See* Springboard Services Agreement, attached as Ex. 2.

30.    The Services Agreement generally tracked Phase I of the Letter Agreement by providing a net income split between Giron and Harmon of seventy-five percent, with Giron receiving a 32.25 percent split and Harmon a 42.75 percent split.

31.    The Services Agreement also confirmed that Giron's individual compensation would include a "separate stock option grant of up to five-percent (5%) undiluted shares of Springboard, Inc. that will vest after fifteen months of execution of this Agreement if Apex and Mission achieve the revenue goal of $3.5 million." Moreover, Springboard agreed that it would "execute the necessary separate stock option agreements within twelve months."

32.    When Giron later questioned Hays about the "up to five percent" language, Hays explained that it was necessary in case Giron voluntarily left Springboard prior to the vesting of the full option.  Thus, it was Giron's understanding that by hitting the $3.5 million revenue target within fifteen months, he was automatically entitled to receive 5% in Springboard stock.

33.    Over the course of the following fifteen months, and by August 2015, Giron surpassed the $3.5 million revenue goal. *See* Mission Revenue Statement, attached as Ex. 3.

34.    According to the plain terms of the Services Agreement, by August 2015, Giron was entitled to receive five percent of undiluted shares in Springboard.  Later, Giron sought confirmation from Hays that Giron was entitled to five percent of Springboard for his performance under the Service Agreement, and Hays responded "Ok. Joe. Yes, we have another crazy year ahead." *See* April, 2016 Email Offer of

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Compensation, attached as Ex. 4.  To date, however, Giron has not received *a single* share of Springboard.

### III.   Giron enters into Independent Contractor Agreement with Springboard for the purpose of continuing to develop EP Savant

35.   Although Giron's staffing business was profitable for Springboard, EP Savant was the driving force behind the business relationship.

36.   In early July 2014, Giron formally presented EP Savant to Duke.  Duke loved it.  Indeed, Duke thought so highly of the concept that it agreed to engage Giron and Springboard to develop EP Savant for use in Duke's cardiac electrophysiology lab.

37.   Thus, on January 15, 2015, Giron entered into an "Independent Contractor Service Agreement, Confidentiality Agreement, and Intellectual Property Assignment" ("IC Agreement") with Springboard for the purpose of developing EP Savant.  *See* IC Agreement, attached as Ex. 5.  The IC Agreement was, in effect, substituted for what had been Phase II under the Letter Agreement.

38.   The IC Agreement states, "Contractor will provide certain professional services to Company, including without limitation, the services provided for in the Duke University/Duke University Health Services System Outside Services Agreement." Attached to the IC Agreement, was the Duke Services Agreement between Springboard and Duke wherein Springboard agreed to deliver the EP Savant program to Duke.

39.   Despite providing the IC Agreement for Giron's acceptance, Springboard did not outline how Giron was to be compensated.  Instead, Section 2 of the IC Agreement states "See Exhibit B, attached to this agreement.  Contractor shall submit all invoices for any sums due within fifteen (15) days from the date of completion." Despite the reference to "Exhibit B," *there was no such attachment to the IC Agreement* and there were no further terms outlining how Giron was to be compensated.

40.   Giron proceeded in the good faith belief, which was bolstered by verbal assurances from Hays, that his eventual compensation would align with what had been set forth as Phase II of the Letter Agreement.  The Letter Agreement provided that Giron

would receive an annual salary, an additional five percent of Springboard stock (for a total of ten percent), and a portion of profits from the assets he contributed to Springboard, i.e., the staffing agency and EP Savant.

41.    Giron's exact compensation remained an ongoing point of contention. Both Giron and Hays recognized that Giron was entitled to more than a bi-monthly paycheck for developing EP Savant. But as EP Savant showed more and more promise, Hays started to backtrack on his earlier assurances.

42.    In March, 2015, Giron proposed a compensation structure for the IC Agreement in which he would receive (i) a 50-50 net income split for all EP Savant related sales and any extensions thereof to other disciplines, and (ii) five percent of undiluted Springboard stock (in addition to the five percent already earned under the Services Agreement). *See* Email Correspondence between Giron and Hays, attached as Ex. 6.

43.    Hays did not accept or decline Giron's offer. Instead, Hays claimed that he needed to see a completed version of EP Savant—despite the clear interest from Duke— before he could ascribe it any concrete value to it.

44.    Due to the continued impasse over his compensation, Giron was left with little choice but to proceed with a good faith understanding (based on many promises from Hays) that his compensation would eventually be defined and that it would include some combination of (i) equity in Springboard or a separate company which would own the intellectual property relating to EP Savant, and (ii) license fees or profit sharing relating to sales of EP Savant, and EP Savant like products. If Giron walked away from Springboard at that point, all his time and energy spent creating EP Savant would have been lost.

45.    In the summer of 2015, still without any defined compensation under the IC Agreement, Giron delivered a working prototype of EP Savant to Duke.

46.    Duke was again thrilled with the product and requested further development. As a result, throughout the fall of 2015, Giron continued to develop EP Savant for a full release. And in February 2016, Giron delivered the full release of EP

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Savant to Duke.  The release was met with great acclaim by Duke, Hays, and the entire Springboard team.  *See* Email from G. Hays Email Correspondence, attached as Ex. 7.

47.     Indeed, Duke was so impressed with EP Savant that it immediately entered into subsequent negotiations to license and copyright the project.  Duke's plan was—and remains—to expand EP Savant training methodology beyond cardiac electrophysiology to other areas in the hospital, such as its orthopedic center.  Duke's desire to license EP Savant added incredible value to the product, but also to Springboard.  By licensing EP Savant, Springboard could use Duke's name and reputation to market the product to other potential customers.

48.     After deciding to expand EP Savant beyond its cardiac electrophysiology lab—a proposition Giron advocated from the beginning—a Duke Administrative Director projected EP Savant's five year profitability to be $97,500,000.00.

**IV.     After Giron successfully develops EP Savant, Hays pushes him out of Springboard**

49.     In March 2016, while Springboard and Duke were in discussions to license and copyright EP Savant, Giron again questioned his compensation under the IC Agreement, which after nearly fifteen months, still remained undefined.

50.     Despite the clear understanding from the Letter Agreement, Hays was reluctant to provide Giron with additional Springboard stock options and he was not willing to pay Giron a 50-50 share of EP Savant.

51.     Likely realizing that Giron's arduous work of developing EP Savant was nearing its conclusion—and, so too, his bargaining power—Hays terminated Giron's "current agreement" and attempted to renegotiate his compensation entirely.

52.     It is unclear what Hays attempted to do next, as his true motives were hidden, but under the auspices of finally defining Giron's compensation under the IC Agreement, Hays made a final take-it-or-leave-it offer to Giron on March 25, 2016.  The offer, however, was well below what Springboard had initially promised for Phase II of the agreement.

Keesmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

53.     After spending years developing EP Savant, and with a wildly successful deal with Duke on the horizon, Giron had little choice but to accept Springboard's reduced offer, which he agreed to on April 7, 2016.  The details of the deal were as follows:

- Guaranteed "minimum" annual compensation of $250,000.00;

- Two percent stock options in Springboard with a six month vesting period upon grant, and an addition three percent in stock options with a four year vesting upon grant (for a total of ten percent when combined with the Services Agreement); and

- Ten percent of the future profitability Springboard's EP Training Division, which was to include EP Savant and any derivative products, such as an online version.

*See* April, 2016 Email Offer of Compensation, attached as Ex. 4.

54.     Giron assented to the terms via email, stating, I "[p]resume this includes the initial 5% for the business as the previous agreement stated," and "I'm going to trust you, trust the process and trust my gut, do what is right and finish this." *Id.*

55.     Unfortunately for Giron, Springboard and Hays were not prepared to do the right thing, but instead began to muscle him out of EP Savant's development.  Beginning in the spring of 2016, Giron became a marginalized figure in Springboard's communication with Duke and in the continued development of EP Savant.  And from June 2016 to September 2016, Springboard completely removed Giron from all EP Savant client relationships and marketing decisions.

56.     Then, in September 2016, Springboard terminated Giron.  Ironically, Hays' purported reason for terminating Giron was that he believed Giron was "too entrepreneurial."  Springboard certainly never considered Giron's entrepreneurship to be a problem when Giron merged his staffing agency into Springboard, or when Giron single-handidly developed EP Savant and subsequently marketed it to Duke.  But as soon as

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Springboard perceived that Giron was no longer necessary to EP Savant and understood Giron's methodology for replication, it pushed him out.

57.     Apparently still aware of Springboard's contractual obligations to Giron, Springboard provided Giron with a stock option agreement in October or November 2016,[1] roughly a month after he was terminated. *See* Stock Option Agreement, attached as Ex. 8.   But rather than provide Giron with ten percent of Springboard stock as Springboard previously agreed, the October 2016 stock offering was for a mere 1000 shares, which is *less than five percent* of Springboard's stock.

58.     Because the stock offer was so much lower than the ten percent that Springboard agreed to, Giron did not accept.

59.     Springboard has also not made any payment to Giron regarding EP Savant's future profits.   Even under the strong-armed agreement Giron was forced to sign, Giron is entitled to a ten percent royalty on all EP Savant revenue.

60.     Despite realizing, creating and marketing EP Savant, Giron's relationship with Springboard has left him with almost nothing to show for it.   Indeed, Springboard has entirely deprived Giron of the anticipated benefits of their bargain.   To date, Giron has still not received a *single* share of Springboard stock, Giron no longer has *any* rights to EP Savant, nor does Springboard appear to believe that Giron is entitled to receive any of EP Savant's future profitability.

61.     Meanwhile, Springboard, via Hays, has transferred the intellectual property for EP Savant and its derivative products from Springboard, Inc. to the Springboard LLC, which is wholly owned by Hays, thereby significantly devaluing Springboard (and the options owed to Giron) and enriching Hays.

62.     Whatever else may be said, it is plain that after swindling Giron out of his life's work, Springboard and Hays stand to profit enormously while Giron receives nothing.

---

[1]       While the agreement is dated in October, Giron did not receive the agreement until sometime in November 2016.

Keresmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

## COUNT ONE
### (Breach of Contract – The Services Agreement)
### (Against Springboard Only)

63.     Plaintiffs reallege and reincorporate by reference all the foregoing allegations as if set forth fully here.

64.     The Services Agreement executed in May 2014, between Mission—through Giron—and Springboard is a valid and enforceable contract.

65.     Mission/Giron fully performed its obligations under the Services Agreement by providing necessary staffing services, and further by achieving the $3.5 million revenue goal within fifteen months, in August of 2015.

66.     Springboard has failed to perform its obligations under the contract, and has—instead—withheld the fundamental consideration contemplated.     Specifically, Springboard refuses to provide Giron with a stock option grant of five percent of Springboard stock pursuant to Section 9 of the Services Agreement.  Hays confirmed that Giron is owed the five percent stock option grant via an email exchange on April 7, 2016.

67.     By its clear failure to provide Giron with a stock option grant, Springboard has breached the Services Agreement.

68.     As a proximate result of Springboard's breach, Giron/Mission has been harmed in amount to be proven at trial, but not less than $10 million.  Springboard's own CEO estimates the company to be worth approximately $200 million, making five percent of the company's stock worth over $10 million.

69.     Under the terms of the Services Agreement, and A.R.S. § 12-341.01, the prevailing party in any dispute regarding the Services Agreement is entitled to repayment of attorneys' fees and costs incurred.

## COUNT TWO
### (Breach of Contract – The IC Agreement)
### (Against Springboard Only)

70.     Plaintiffs reallege and reincorporate by reference all the foregoing allegations as if set forth fully here.

71.     The IC Agreement between Giron and Springboard is a valid and enforceable contract.

72.     Giron performed his obligations under the IC Agreement by delivering a complete, workable version of EP Savant to Duke.

73.     Springboard failed to perform its obligations under the Services Agreement by refusing to provide the consideration it proposed, namely an additional five percent of Springboard stock, and ten percent of EP Savant's future profitability.

74.     By refusing to provide Giron with the five percent Springboard stock option or any of EP Savant's profits, Springboard has committed a material breach of the IC Agreement.

75.     As a proximate result of Springboard's multiple breaches of the IC Agreement, Giron has been harmed in amount to be proven at trial, but not less than $19.5 million.

76.     Pursuant to A.R.S. § 12-341.01, the Giron is also entitled to his attorneys' fees and costs incurred.

## COUNT THREE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)
### (Against Springboard Only)

77.     Plaintiffs reallege and reincorporate by reference all the foregoing allegations as if set forth fully here.

78.     A covenant of good faith and fair dealing is implied as a matter of law in the Services Agreement and in the IC Agreement.

79.     By refusing to provide Giron the compensation set out by each agreement, namely Springboard stock options and the rights to EP Savant's future profitability, Springboard breached the covenant of good faith and fair dealing, denying Plaintiffs the rightful benefits of their bargain.

80.     As a proximate result of Springboard's breach, Plaintiffs have suffered harm in an amount to be proven at trial.

Kersmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

Keresmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

## COUNT FOUR

### (In the Alternative, Declaratory Judgment Respecting the IC Agreement)

### (Against Springboard and Springboard LLC)

81.     Plaintiffs reallege and reincorporate by reference all the foregoing allegations as if set forth fully here.

82.     The IC Agreement was executed in January 2015, but did not include the details of Giron's compensation.

83.     By failing to provide for Giron's compensation, the IC Agreement lacks consideration and/or mutual assent and is, therefore, neither valid nor enforceable.

84.     Because the IC Agreement is not a valid and enforceable contract, the IC Agreement's assignment of Giron's intellectual property rights and assets —including the rights to EP Savant and EP Savant like products—is void.  Giron is entitled to retain his intellectual property rights and assets in full, including EP Savant.

85.     A valid and justiciable controversy therefore exists as to the rights of the parties respecting the enforceability of the IC Agreement and the assignment of Giron's intellectual property assets.

86.     By reason of the foregoing, Giron is entitled to a judgment declaring the IC Agreement invalid and unenforceable for lack of consideration; as a result, any transfer of Giron's intellectual property rights and assets was also invalid.

## COUNT FIVE

### (Material Misrepresentations Under Securities and Exchange Act § 10b and S.E.C. Rule 10b-5)

### (Against Hays Only)

87.     Plaintiffs reallege and reincorporate by reference all the foregoing allegations as if fully set forth here.

88.     Hays made multiple material misrepresentations to Giron concerning the Springboard stock or stock options to which Giron was to be entitled for (a) merging his staffing company into Springboard, and (b) developing EP Savant with Springboard.

89.     First, with respect to the Services Agreement, Hays promised on multiple occasions to deliver "undiluted" stock options totaling 5% of Springboard to Giron, as shown by the Letter Agreement and Services Agreement, both of which reference equity compensation, despite Hays' intention never to fulfill that promise.

90.     The stock options for 1000 shares of Springboard which Hays purported to grant Giron in October, 2016 (and then wrongfully rescinded) contained no dilution protections and were highly restricted.

91.     Second, with respect to the IC Agreement and Giron's development of EP Savant, Hays again promised to deliver to Giron stock options for another 5% of Springboard stock, but instead Hays terminated Giron shortly after making that promise without having delivered the stock options which Hays had promised Giron, as shown by the April, 2016 email correspondence between Hays and Giron.

92.     Third, Hays represented to Giron that Springboard would be the owner of EP Savant and its derivative products, so that when Giron received the 10% equity in Springboard to which he was entitled, Giron's ownership of Springboard would equate to ownership in EP Savant and its derivative products.  This is shown by the negotiations between Giron and Hays pertaining to Giron's development of EP Savant during the months leading up to April 2016, wherein Hays oscillated between forming a separate company for EP Savant and make Joe a 50-50 partner in the new company, and consolidating EP Savant with Springboard's existing operation and granting Giron additional stock in Springboard.  Ultimately, Hays purported to consolidate EP Savant with Springboard's existing operations and grant Giron additional stock in Springboard. Hays though never intended to grant Giron the Springboard stock, and instead transferred EP Savant into the Springboard LLC, for little or no consideration, thereby appropriating the value of EP Savant for himself and materially impairing the value of the stock options to which Giron is entitled.

93.     Giron relied on Hays' misrepresentations and has incurred damages as a result of them, specifically, in an amount equivalent to the proportionate value of EP Savant and its derivative products to which Giron's 10% ownership in Springboard should have entitled him.

**COUNT SIX**

**(In the Alternative, Quantum Meruit/Unjust Enrichment)**
**(Against Springboard and Springboard LLC)**

94.    Plaintiffs reallege and reincorporate by reference all the foregoing allegations as if set forth fully here.

95.    Giron agreed to produce a complete version of EP Savant for Springboard, which was to be delivered for use at Duke's cardiac electrophysiology lab.

96.    Springboard accepted the full benefit of Giron's work, receiving compensation from Duke directly, including a deal to license and copyright EP Savant.

97.    Giron did not intend or expect to create EP Savant for Springboard gratuitously.  Instead, Giron anticipated that he would receive a salary, plus five percent of Springboard stock, and a fifty percent share of EP Savant's future profit.

98.    Indeed, Springboard knew that Giron expected to paid for his work and did promise to pay Giron for such work in the form of a salary, Springboard stock, and a share of EP Savant's future profitability.

99.    Springboard, however, refuses to provide Giron any of its stock and further refuses to pay him any portion of EP Savant's profit.

100.    It is plain that it would be unjust for Springboard to retain its entire stock and the exclusive profit from EP Savant while Giron receives nothing.  Accordingly, Giron is entitled to five percent of Springboard's stock, and *at least* fifty percent of Springboard's future profits, or no less than $45,000,000.00 over the next five years.

101.    It is also unjust to allow Springboard and/or Springboard LLC to continue to benefit from Giron's work and relationships that Springboard did not compensate Giron for.  Giron is entitled to all monies earned by Springboard and/or Springboard LLC from Duke University and other companies that have paid Springboard for the use of Giron's intellectual property.

**WHEREFORE**, Plaintiffs demand judgment against Springboard, Inc., Springboard, LLC and Gavin Haysas follows:

Keresmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

A.      As to Springboard, compensatory damages in an amount to be proven at trial, but no less than the statutory minimum for this Court;

B.      As to Springboard, LLC, compensatory damages in an amount to be proven at trial, but no less than the statutory minimum for this Court;

C.      As to Hays, compensatory damages in an amount to be proven at trial, but not less but no less than the statutory minimum for this Court;

D.      Pre-judgment and post-judgment interest at the maximum rate allowed by law;

E.      Reasonable attorneys' fees, costs and expenses as provided under the Lease, or alternatively, under A.R.S. § 12-341 and A.R.S. § 12-341.01(A); or

F.      A declaratory judgment declaring that the IC Agreement is invalid and unenforceable for lack of consideration and/or lack of mutual assent; as a result, any transfer of Giron's intellectual property rights and assets was also invalid;

G.      Quantum meruit damages in an amount to be proven at trial, but in no event less than five percent of Springboard's stock, and fifty percent of EP Savant's future profitability;

H.      Such further relief as this court deems just and proper.


RESPECTFULLY SUBMITTED this 30th day of October, 2017.


KERCSMAR & FELTUS PLLC


By _____
    Gregory B. Collins
    Seth T. Goertz
    7150 East Camelback Road, Suite 285
    Scottsdale, Arizona 85250
    *Attorneys for Plaintiffs Joe A Giron and Mission Medical Services, Inc.*

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

# EXHIBIT 1



Tom Harmon/Apex
Joe Gron/Mission

April 25, 2014

Joe/Tom

I am pleased to present you with the following proposal outline for the purposes of creating a mutually beneficial relationship with APEX/MISSION & WestWays. Please don't mistake the brevity of this format for a lack of interest. In addition to the advantages of becoming part of the SpringBoard team and aligning yourself with a niche focused firm; SpringBoard has engaged and focused management committed to building a firm with a national presence.

Among the several significant advantages to combining our business interests with Springboard are:

➤ We are a financially stable company with an outstanding track record nationally in cardiac services
➤ A strong, transparent culture and management with a vision that breeds success.
➤ Technology and operational systems that enable us to scale.

Based on business needs and objectives SpringBoard believes a phased approach will be the most expeditious in meeting shared goals.

**PHASE I**
- Integrate California business through either the purchase of WestWays interest, or separate integration, under full separate P&L.
- Full P&L transparency, all expenses allocated (corporate overhead, insurances, commission to SBI team, etc.)
- Net Income Split as follows. 75% Apex/Mission, SBI 25%.
- Payments reconciled and made to your entities quarterly until such time as we agree on step 2.
- Client and talent facing branding to be under SpringBoard.
- Non-Solicitations executed.
- Stock Options = up to 5% each undiluted shares of SBI vested after 15 months providing 3.5M REV achieved within 15months.
- Background and Drug Testing on each stakeholder prior to execution.
- Either party may cancel with 60 days written notice.
- Advance rate: 10% of previous months billing total allocated according as instructed, deducted at quarterly reconciliation.

**PHASE II**
- Transition to Salaried W-2 employees.
- After Phase 1 (15months), upon mutual agreement.
- Additional option grant for up to a total 10% holding each combined Phase I&II.
- Options grant award based on achieving mutually agreed upon performance targets.

I look forward to your comments and would like to discuss the enclosed this week.

Sincerely,

Gavin Hays
SpringBoard, Inc.
Gavin.hays@springboardstaffing.com
866.465.6266

6970 E. Chauncey Lane, #110 • Phoenix, AZ 85054•Phone 866-465-6266•Fax 877-890-5343

CONFIDENTIAL

# EXHIBIT 2



# SERVICES AGREEMENT

This Agreement for Recruiting and Placing Temporary Healthcare Workers (this "Agreement") is effective as of May ___, 2014, ("Effective Date") by and between SpringBoard, Inc., an Arizona corporation ("SpringBoard"), Apex Medical Staffing, LLC, a California limited liability company ("Apex"), and Mission Medical Services, Inc., a California corporation ("Mission"). Each of SpringBoard, Apex and Mission shall sometimes be referred to in this agreement as a "party" and collectively as the "parties".

1.  **Statement of Work**

    SpringBoard has requested that Apex and Mission recruit and place Contract Workers (as hereinafter defined) pursuant to the terms and conditions set forth in this Agreement. Subject to the provisions of this Agreement, Apex and Mission will diligently recruit Contract Workers and develop business opportunities for SpringBoard using SpringBoard's name. SpringBoard's trade name and marks shall remain the separate intellectual property of SpringBoard, though Apex and Mission are granted use rights under this Agreement. As used in this Agreement, the term "Contract Workers" shall mean temporary healthcare workers placed on job assignments by Apex and/or Mission using SpringBoard's name and agreements in the Southern California Territory as defined in Exhibit A.

2.  **Contract Workers Provide Services to Healthcare Facilities**

    Apex and Mission will recruit and place Contract Workers at healthcare facilities to provide services using SpringBoard's name. When placing Contract Workers at healthcare facilities and when interacting with Contract Workers or potential contract workers, Apex and Mission will use exclusively the name "SpringBoard" and will use its best efforts to increase SpringBoard's branding and name recognition in the market. SpringBoard is not Apex's or Mission's legal partner, co-venturer, joint venture, principal, agent, insurer, joint employer or representative. No Contract Worker has any claim to SpringBoard's or Apex's or Mission's revenues related to their work. SpringBoard, Apex and Mission are solely responsible for meeting their goals for profits, costs, production, and scheduling. Contract Workers have no authority to legally bind Apex, Mission or SpringBoard.

    Apex and Mission agree that each Contract Worker shall possess, in all material respects, the skills and abilities required to provide such services, including the necessary credentialing paperwork to meet SpringBoard's Joint Commission Certification.

3.    **Contract Workers' Compensation**
      SpringBoard will pay, or cause to be paid, the wages of the Contract Workers, and
      SpringBoard will be responsible for withholding, or causing the withholding of, all
      applicable federal, state and local taxes, including Federal Insurance Contributions Act
      ("FICA") taxes, from Contract Workers' wages and SpringBoard shall provide, or cause
      to be provided, workers' compensation coverage meeting statutory coverage limits.

4.    **Direction and Supervision**
      Apex and Mission are recruiting and supplying the Contract Workers to healthcare
      facilities to supplement their work force.  SpringBoard employees may communicate
      directly with the Contract Workers placed by Apex and/or Mission on the job assignment
      as necessary to further SpringBoard's business interests.  SpringBoard is not supplying
      persons to supervise or oversee the Contract Workers during their assignment to
      healthcare care facilities unless otherwise agreed to in writing.

5.    **Replacement or Release of Unsatisfactory Workers**
      Apex, Mission and SpringBoard have the right at all times to end the assignment of any
      Contract Worker.

6.    **Parties' Responsibilities**
      In general, with regard to the Contract Workers assigned under this Agreement,
      SpringBoard shall perform or cause to be performed the following:

      - Maintaining payroll records;
      - Calculating and paying wages;
      - Withholding and remitting payroll taxes and other government-mandated charges;
      - Identifying ongoing contract assignments;

      In general, with regard to the Contract Workers assigned under this Agreement, Apex
      shall perform or cause to be performed the following:

      - Providing Contract Workers' time records to SpringBoard in a timely manner;
      - Calculating and reviewing hours worked;
      - Hiring, assigning, reassigning, counseling, disciplining, and discharging; and
      - Handling work-related claims and complaints;

      SpringBoard, Apex and Mission shall be responsible for maintaining personnel records,
      including necessary credentialing paperwork to meet SpringBoard's Joint Commission
      Certification.  Apex and Mission will transfer all Contract Worker personnel files to
      SpringBoard within 30 days of executing this Agreement.  At no time will Apex or
      Mission remove any personnel files of Contract Workers without SpringBoard's prior
      written authorization.

7.    **Disclaimer of Liability**
      SpringBoard has no liability to Apex or Mission for any claim, loss, or liability of any
      kind resulting from or otherwise arising out of any of the following:

2

a.    Apex's or Mission's failure to adequately supervise or control Contract Workers, provide a safe, discrimination free, and lawful work environment or safeguard Apex's or Mission's premises, processes, or systems; or without SpringBoard's express prior written approval, entrusting Contract Workers with unattended premises, cash, checks, keys, credit cards, merchandise, confidential or trade secret information, negotiable instruments, or other valuables.

b.    Claims by Contract Workers for benefits, compensation, damages, discrimination, harassment, wrongful termination, contributions, or penalties under any employee benefit plans sponsored and maintained by Apex or Mission, whether or not Apex's or Mission's plans exclude Contract Workers from coverage.

c.    Promises of increased compensation, bonuses, or benefits made by Apex or Mission to Contract Workers.

d.    Claims by any person relating to Apex's or Mission's service.

e.    Apex's or Mission's assigning Contract Workers to duties different from their original duties for which Apex or Mission supplied the Contract Worker to a healthcare facility or Apex's or Mission's making substantial changes to Contract Workers' job duties or risks without SpringBoard's prior written approval.

f.    The conduct of Apex's or Mission's officers, employees, and agents.

g.    Failure by Apex or Mission to provide Contract Workers with a safe work site.

h.    Claims for special, indirect, consequential, punitive, or lost profit damages.

i.    A violation or breach by Apex or Mission of any law, statute, or regulation.

j.    Property damage or personal injury, including death, arising out of or resulting from acts or omissions of the Contract Workers.

8.    **Indemnification**
Apex and Mission, except to the extent specifically disclaimed or limited in this Agreement, indemnify and hold SpringBooard harmless from and against all costs and expenses, including reasonable attorneys' fees and the reasonable costs of investigation resulting from, or arising out of, any violation of Federal, state or common law arising out of any actions of Apex or Mission, or Tom Harmon ("Harmon") and Joe Giron ("Giron").

9.    **Billing, Payment of Commissions, and Equity**
Apex and Mission agree that all contracts with Contract Workers and healthcare facilities will be executed under the SpringBoard name. Payments for Contract Workers' services shall be sent to SpringBoard's corporate offices. Only those Contract Workers' services billed and paid pursuant to a SpringBoard agreement are eligible for Net Income split and an advance. Apex and Mission will split with SpringBoard the Net Income generated from the Contract Workers after all expenses have been allocated. SpringBoard will provide Apex and Mission with full access to profit and loss statements showing the allocation of expenses, including, but not limited to, corporate overhead, insurance, commissions, and wages. Apex will receive forty-two and three-quarters percent (42.75%) of the Net Income, Mission will receive thirty-two and one-quarter percent

(32.25%) and SpringBoard will receive twenty-five percent (25%) of the Net Income from the Contract Workers (collectively "Net Income Split"). SpringBoard will calculate and pay Net Income on a quarterly basis. Quarterly Net Income Split payments will be made on or about the 20th day of the month following the end of the quarter. If Apex or Mission stops providing service under this Agreement, SpringBoard reserves the right to adjust the Net Income Split.

SpringBoard will provide Apex with an advance of ten-percent (10%) of the previous month's billed services. Payments will be made on or about the 20th day of the following month. SpringBoard will make any necessary adjustments to the Net Income Split at the quarterly reconciliation.

SpringBoard shall provide Apex and Mission, or Tom Harmon ("Harmon") and Joe Giron ("Giron"), with a separate stock option grant of up to five-percent (5%) undiluted shares of SpringBoard, Inc. that will vest after fifteen months of execution of this Agreement if Apex and Mission achieve the revenue goal of $3.5 million from Contract Workers. SpringBoard, Apex and Mission, or Harmon and Giron, agree to execute the necessary separate stock option agreements within twelve months.

In the event no agreement/promissory note is reached with Harold Sterling and West Ways Staffing, Joe Giron may receive an advance towards commissions not to exceed $7500. The $7500 to be repaid by Joe within 90 days.

10. **Termination of this Agreement**
Any party may terminate this Agreement by giving 60 days' written notice of termination to the other parties. Any party may give written notice to the other parties of a breach of this Agreement, and if the breaching party fails or refuses to remedy such default within ten (10) days of the date of said notice, the notifying party may terminate this Agreement immediately by a second written notice and termination shall be effective as of the date of the second notice. Except as otherwise expressly provided in this Agreement, termination for default shall be without prejudice to any other rights or claims the aggrieved party may have against the other party. Breaches shall be deemed to include but not be limited to (i) material failure of a party to fulfill its obligations under this Agreement, (ii) an adjudication of bankruptcy or insolvency under any bankruptcy or insolvency law, or (iii) the commission of a receiver for the business or property of a party or its making of any general assignment for the benefit of its creditors. The provisions of Paragraphs 6, 7, 8, 10, 11, 12, 13, 18, 19, and 20 of this Agreement will remain in effect after termination. Termination of this Agreement prior to execution of the stock option agreement will eliminate any potential stock option grant.

11. **Insurance and Liability**
During the term of this Agreement, SpringBoard will maintain, or cause to be maintained, the following insurance coverages:

| Type | Coverage Limits |
|------|-----------------|
| a. Standard workers' compensation | Statutory |
| b. General liability | $ 1,000,000 |
|    i. Each Occurrence | $ 1,000,000 |
|    ii. General Aggregate | $ 2,000,000 |
| c. Comprehensive automobile liability (Hired, Non-Owned) | $ 1,000,000 |
| d. Excess umbrella liability | $ 2,000,000 |

Apex, Mission and SpringBoard agree that SpringBoard's total potential liability to Apex and/or Mission for any claims, losses, expenses, or damages whatsoever arising out of or in any way related to this Agreement from any cause or causes, including SpringBoard's negligence, will not exceed the total amount paid to SpringBoard or paid on SpringBoard's behalf by its insurers under these coverages in settlement or satisfaction of Apex's and/or Mission's claim.

EXCEPT IN CONNECTION WITH ANY PAYMENT OBLIGATIONS OR ANY INDEMNITIES HEREUNDER, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, SPECIAL OR PUNITIVE DAMAGES OR EXPENSES OR LOST PROFITS (REGARDLESS OF HOW CHARACTERIZED AND EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES) UNDER OR IN CONNECTION WITH THIS AGREEMENT, REGARDLESS OF THE FORM OR ACTION (WHETHER IN CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, STATUTORY LIABILITY OR OTHERWISE).

12.   **Confidential Information**
Apex and Mission recognize that they may have access to certain information that SpringBoard considers to be proprietary and confidential, and designate as such. Apex and Mission agree to treat this information as confidential and not to disclose it to any third person.

Proprietary or confidential information does not include any of the following:

a.   Information that, at the time of disclosure, is generally available to the public.

b.   Information that, after disclosure, becomes generally available to the public by publication or otherwise.

c.   Information that was in Apex's of Mission's possession prior to disclosure and that was not acquired directly or indirectly from SpringBoard.

d.   Information that Apex or Mission received after the time of disclosure from a third party that did not impose an obligation of confidentiality and did not acquire any such information directly or indirectly from SpringBoard.

e.   Information as may be authorized by SpringBoard to be disclosed.

13.   **No Solicitation or Hiring of Contract Workers by Apex or Mission**

5

During the term of this Agreement and for 180 days after the effective date of any party's termination of this Agreement, Apex and Mission agree not to directly or indirectly solicit, retain, employ, or hire as an employee or independent contractor in competition with SpringBoard in the Southern California Territory any Contract Worker or healthcare professional whose identity Apex or Mission learned through its engagement with Springboard.

If Apex and/or Mission violates this paragraph, then Apex and/or Mission agrees to immediately pay to SpringBoard a fee in the amount of 100% of the Contract Worker's annualized compensation from SpringBoard, or $35,000, whichever figure is higher. The parties agree that this amount is for liquidated damages incurred by SpringBoard, and is not a penalty.

14. **Equal Employment Opportunity**
Apex and Mission provide or causes to provide employment, training, compensation, promotion, and other conditions of employment without regard to race, color, religion, national origin, sex, marital or veteran status, age, or disability.

15. **Drug Testing and Background Check**
Harmon and Giron agree to submit to drug testing and a background check prior to performing any services under this Agreement. SpringBoard reserves the right to terminate this Agreement if any party does not pass the drug test or if any party has a criminal history that raises doubts about ability to perform services under this Agreement. SpringBoard will provide copies of such test results if an adverse action will be taken to provide Harmon or Giron with an opportunity to contest the results.

16. **No Waiver of Terms**
The failure of any party to enforce at any time, or from time to time, any provision of this Agreement will not be construed as a waiver of any of the terms or conditions of this Agreement.

17. **Amendment and Assignment**
This Agreement may only be amended by another signed, written agreement between the parties that expressly amends, terminates, or supersedes this Agreement. Any party may assign this Agreement if the other party agrees in writing, and such agreement will not be unreasonably withheld.

a. If Mission/Joe Giron shall die, or become disabled from performing his functions as such for a period of time such that the viability of the business is endangered to the reasonable opinion of SpringBoard. SpringBoard and Apex agree that any commissions payable to Mission/Joe Giron shall continue for the period of this agreement.

18. **Validity of Terms**
If any term or provision of this Agreement is held by a court of competent jurisdiction to be void, illegal, unenforceable, or in conflict with any law of a federal, state, or local government having jurisdiction over this Agreement, the validity of the remaining

portions or provisions of this Agreement will remain in effect.

19. **Entire Agreement**

This Agreement constitutes the entire agreement between Apex, Mission and SpringBoard, and no other understanding that modifies the terms hereof will be binding unless made in writing and signed by authorized representatives of Springboard and Apex and/or Mission.

20. **Construction, Jurisdiction and Venue**

This Agreement will be construed and governed by the laws of the State of Arizona. The parties agree that the state and federal courts in Maricopa County, Arizona have exclusive jurisdiction and are the sole venue for any litigation between the parties arising out of or relating to this Agreement. Before any litigation, the parties agree to first mediate all disputes within forty-five days of either party requesting mediation, in Phoenix, Arizona, before a private mediator selected by the parties or, if they cannot agree on a mediator, then the mediator will be selected by the Presiding Judge of the Maricopa County, Arizona Superior Court. The parties will equally share the mediator's fees. The prevailing party in any litigation between the parties will be entitled to recover its court costs, all mediation expenses, and reasonable attorneys' fees from the other party.

21. **Notice**

Whenever notice is required under this Agreement, the notice will be given in writing and will be hand-delivered, e-mailed, or mailed, certified mail, return receipt requested, as follows:

To Apex:       <u>Tom Harmon</u>

To Mission:    <u>Joe Giron</u>

To SpringBoard:    Gavin Hays
6970 E. Chauncey Lane, Ste 110
Phoenix, Arizona 85054
gavin.hays@springboardstaffing.com

22. **Anticipated Future Employment.**

SpringBoard anticipates that if Apex and/or Mission meet the revenue goal of $3.5 million over the fifteen months following execution of this Agreement, that Harmon and/or Giron will be offered employment directly with SpringBoard as salaried W-2 employees. At SpringBoard's discretion it is anticipated that, based on Harmon's and/or Giron's performance in meeting mutually agreed upon goals, Harmon and/or Giron, or

7

Apex and/or Mission, will be offered additional stock option grants in SpringBoard. Such additional grants will be documented through separate agreements.

IN WITNESS WHEREOF, the parties hereto have made and executed this Agreement in Phoenix, Arizona effective as of the day and year first above written.

APEX MEDICAL STAFFING, LLC, a                    MISSION MEDICAL SERVICES, INC.,
CALIFORNIA limited liability company              a CALIFORNIA corporation

_____                  _____
Tom Harmon                                        Joe Giron

_____                  _____
Title                                             Title

_____                  _____
Date                                              Date

SPRINGBOARD STAFFING, INC.,
an Arizona corporation

_____
Gavin Hays

_____
Title

_____
Date

8

# EXHIBIT 3

SpringBoard - California
2015 - Jan 1 - Dec 31
Commission Calculator & Lookback

| | | Q-1 Total | Q-2 Total | Q-3 Total | OCT | NOV | DEC | Q-4 Total | GRAND TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| # of Saturdays | | 13 | 13 | 13 | 5 | 4 | 4 | 13 | 52 |
| Sales Revenue | | $ 1,033,210 | $ 1,055,528 | $ 1,379,829 | $ 452,078 | $ 391,240 | $ 341,590 | $ 1,184,909 | $ 4,653,476 |
| Cost of Sales | | 766,984 | 729,880 | 1,099,808 | 339,393 | 289,503 | 280,325 | 909,221 | 3,505,893 |
| Gross Profit | | 266,226 | 325,648 | 280,022 | 112,685 | 101,737 | 61,265 | 275,688 | 1,147,583 |
| *Gross Profit %* | | 25.8% | 30.9% | 20.3% | 24.9% | 26.0% | 17.9% | 23.3% | 24.7% |
| Expenses-direct | | 133,308 | 313,669 | 125,299 | 54,567 | 39,865 | (1,244) | 93,188 | 665,463 |
| Net Profit | | $ 132,918 | $ 11,979 | $ 154,723 | $ 58,118 | $ 61,873 | $ 62,509 | $ 182,500 | $ 482,120 |
| less: Commissions-Outside | | (129,344) | (307,208) | (119,076) | (44,445) | (38,948) | | (83,393) | (639,022) |
| Profit b4 Comm | | $ 262,262 | $ 319,187 | $ 273,799 | $ 102,563 | $ 100,821 | $ 62,509 | $ 265,893 | $ 1,121,141 |
| Less: Allocated Expense | | (43,944) | (96,119) | (69,519) | | | | (99,340) | (308,922) |
| Income to distribute | | $ 218,318 | $ 223,069 | $ 204,280 | $ 102,563 | $ 100,821 | $ 62,509 | $ 166,552 | $ 812,219 |
| | | 21.1% | 21.1% | 14.8% | | | | 14.1% | |
| SpringBoard | 25% | 54,579 | 55,767 | 51,070 | 25,641 | 25,205 | 15,627 | 41,638 | |
| Apex (TH) | 42.75% | 93,331 | 95,362 | 87,330 | 43,846 | 43,101 | 26,723 | 71,201 | |
| Mission (JG) | 32.25% | 70,408 | 71,940 | 65,880 | 33,077 | 32,515 | 20,159 | 53,713 | |
| Total | 100% | 218,318 | 223,069 | 204,280 | 102,563 | 100,821 | 62,509 | 166,552 | 166,552 |
| **Advance Payments:** | | | | | | | | | |
| Apex | | | | | 25,556 | 22,395 | | | |
| Apex Total Advances | | 121,909 | 96,841 | 59,797 | 25,556 | 22,395 | - | 47,951 | |
| Mission | | | | | 18,889 | 16,553 | | | |
| Mission Total Advanc | | 77,797 | 73,055 | 59,279 | 18,889 | 16,553 | - | 35,442 | |
| APEX : Net Profit&Loss Share | | 93,331 | 95,362 | 87,330 | | | | 71,201 | |
| less advances | | (121,909) | (96,841) | (59,797) | | | | (47,951) | |
| Current Quarter Amt Due | | (28,578) | (1,479) | 27,533 | | | | 23,250 | |
| Lookback Adjustments | | | | | | | | (2,524) | |
| | | | | | | Net Due: | | 20,726 | |
| MISSION : Net Profit&Loss Share | | 70,408 | 71,940 | 65,880 | | | | 53,713 | |
| less advances | | (77,797) | (73,055) | (59,279) | | | | (35,442) | |
| Current Quarter Amt Due | | (7,389) | (1,115) | 6,601 | | | | 18,271 | |
| Lookback Adjustments | | | | | | | | (1,903) | |
| | | | | | | Net Due: | | 16,368 | |

**SpringBoard, Inc.**
# SBI California - Profit & Loss
**October through December 2015**

8:38 AM
01/27/2016
Accrual Basis

|  | Oct - Dec 15 | Jan - Dec 15 |
|---|---|---|
| **Ordinary Income/Expense** | | |
| **Income** | | |
| **SBI CA Contract Staffing Income** | | |
| SBI CA Discounts & Credits | -21,924.48 | -26,807.87 |
| SBI CA - EP | 0.00 | 28,510.83 |
| SBI CA Contract Staffing Income | 1,190,543.45 | 4,583,784.14 |
| SBI CA Contract Staffing Income - Other | 16,290.25 | 67,989.12 |
| **Total SBI CA Contract Staffing Income** | 1,184,909.22 | 4,653,476.22 |
| **Total Income** | 1,184,909.22 | 4,653,476.22 |
| **Cost of Goods Sold** | | |
| **SBI CA Cost of Sales** | | |
| SBI CA Referral Bonus | 500.00 | 500.00 |
| SBI CA Relo & Lodging Costs | 4,301.00 | 4,301.00 |
| SBI CA Relo & Lodging Costs | 6,864.70 | 48,738.93 |
| SBI CA Vendor Maintenance Fees | 19,939.59 | 86,526.92 |
| SBI CA Rad Badges | 304.49 | 666.99 |
| SBI CA Background Check | 913.06 | 2,198.36 |
| SBI CA Drug Test | 572.00 | 3,165.70 |
| SBI CA Lodging | 230,492.26 | 920,627.14 |
| SBI CA Meals and Incidentals | 161,657.73 | 606,186.27 |
| **SBI CA Contract Staffing Costs** | | |
| SBI CA Contract Staffing Wages | 422,238.34 | 1,245,446.19 |
| SBI CA Payroll Tax Burden | 34,193.63 | 106,538.87 |
| SBI CA Health Ins Benefits | 5,835.29 | 24,688.81 |
| SBI CA Worker Comp Ins | 18,530.11 | 52,998.09 |
| SBI CA Payroll Processing Cost | 2,879.16 | 8,120.94 |
| SBI CA Contract Staffing Costs - Other | 0.00 | 394,938.65 |
| **Total SBI CA Contract Staffing Costs** | 483,676.53 | 1,832,731.55 |
| SBI CA Cost of Sales - Other | 0.00 | 250.05 |
| **Total SBI CA Cost of Sales** | 909,221.36 | 3,505,892.91 |
| **Total COGS** | 909,221.36 | 3,505,892.91 |
| **Gross Profit** | 275,687.86 | 1,147,583.31 |
| **Expense** | | |
| **SBI CA Expenses** | | |
| SBI CA Commission Exp-outside | 120,487.00 | 639,021.62 |
| **SBI CA Commission Cost** | | |
| SBI CA Commission-Payroll Tax | 91.82 | 705.30 |
| SBI CA Commission-Work Comp Ins | 0.00 | 15.84 |
| SBI CA Commission Cost - Other | 8,893.78 | 29,374.55 |
| **Total SBI CA Commission Cost** | 8,985.60 | 30,095.69 |
| SBI CA Drug Test-Admin | 0.00 | 190.77 |

|  | Oct - Dec 15 | Jan - Dec 15 |
|---|---|---|
| SBI CA Background-Admin | 0.00 | 63.90 |
| SBI CA Travel Expense | 582.57 | 662.29 |
| SBI CA Legal Expense | 0.00 | -4,869.02 |
| SBI CA Expenses - Other | 226.95 | 297.83 |
| Total SBI CA Expenses | 130,282.12 | 665,463.08 |
| Total Expense | 130,282.12 | 665,463.08 |
| Net Ordinary Income | 145,405.74 | 482,120.23 |
| Net Income (before allocated expenses) | 145,405.74 | 482,120.23 |

# EXHIBIT 4

From: **Joe Giron** jgiron@springboardhealthcare.com 📎
Subject: Re: Stock Options (confidential)
Date: April 8, 2016 at 10:41 AM
To: Gavin Hays ghays@springboardhealthcare.com
Cc: jcgiron@mac.com



Here you go, I initialed that structure you wrote, attached.

Doe the first bi-weekly come out on 4/15?



Agreement-
JG.pdf

Blessings,

Joe Giron
RN, CRT(R)(F), RCIS, RCES, CEPS, FSICP
*EP Project Consultant* | **SpringBoard Healthcare**
909-702-9992 | jgiron@springboardhealthcare.com



On Apr 7, 2016, at 4:11 PM, Gavin Hays <ghays@springboardhealthcare.com> wrote:

Ok. Joe. Yes, we have another crazy year ahead. Can you please initial and scan back the last draft I sent you. I'll put into one document , and then yes. Let's change the world I like that.

On Thu, Apr 7, 2016 at 3:55 PM, Joe Giron <jgiron@springboardhealthcare.com> wrote:
Sounds fine. Im in. Lets go forward. Presume this includes the initial 5% for the business as the previous agreement stated.

Thought long and hard on what to do, VERY stressful last few weeks, we've had/have trust issues, however I love this team and what we are doing is changing the industry.

It will be awesome to have that hard work rewarded, either way, I'm going to trust you, trust the process and trust my gut, do what is right and finish this…Going to get out of my own way, and do what is right by all involved. People, systems…are getting better at their jobs, earning more for it, providing better patient care because of this…it couldn't be anymore of an HONOR.

Lets change the world!

Blessings,

Joe Giron
RN, CRT(R)(F), RCIS, RCES, CEPS, FSICP
*EP Project Consultant* | **SpringBoard Healthcare**
909-702-9992 | jgiron@springboardhealthcare.com

<Screen Shot 2015-06-12 at 1.21.18 PM.png>

On Apr 7, 2016, at 2:51 PM, Gavin Hays <ghays@springboardhealthcare.com> wrote:

Hi Joe,

At this point what I think I  understand from our last call  is that we have agreement on what we have discussed in what I sent over last. And, that you want an idea of what the stock options will look like. As I mentioned I'm reluctant to do this. However, based on what I know today this is what I am comfortable outlining to you. This requires the paperwork still to be completed which will be done in the next few months. Here is what it will look like:


2% Stock Options with a 6 month vesting upon grant.

3% Stock Options with a 4 year vesting upon grant.

Drag along provision if the company were to sell you'd automatically vest.


At this point Joe I think we can agree I've done what you asked and would like to move on. Please initial the last outline I sent you with the guaranteed amount and bonus outline and scan back. I will write it up and include this into an agreement so we can move forward. If not, it's probably best we don't proceed to HRS together.



Gavin


--
Gavin Hays
SpringBoard, Inc
623.516.8001 o
866.465.6286 t
877.890.5343 f



--
Gavin Hays
SpringBoard, Inc
623.516.8001 o
866.465.6286 t
877.890.5343 f



**From:** Joe Giron jgiron@springboardhealthcare.com 🔗 🏴
**Subject:** Re: Stock Options (confidential)
**Date:** April 7, 2016 at 3:55 PM
**To:** Gavin Hays ghays@springboardhealthcare.com
**Cc:** jcgiron@mac.com

Sounds fine. Im in. Lets go forward. Presume this includes the initial 5% for the business as the previous agreement stated.

Thought long and hard on what to do, VERY stressful last few weeks, we've had/have trust issues, however I love this team and what we are doing is changing the industry.

It will be awesome to have that hard work rewarded, either way, I'm going to trust you, trust the process and trust my gut, do what is right and finish this...Going to get out of my own way, and do what is right by all involved. People, systems...are getting better at their jobs, earning more for it, providing better patient care because of this...it couldn't be anymore of an HONOR.

Lets change the world!

Blessings,

Joe Giron
RN, CRT(R)(F), RCIS, RCES, CEPS, FSICP
*EP Project Consultant* | **SpringBoard Healthcare**
909-702-9992 | jgiron@springboardhealthcare.com



On Apr 7, 2016, at 2:51 PM, Gavin Hays <ghays@springboardhealthcare.com> wrote:

Hi Joe,

At this point what I think I understand from our last call is that we have agreement on what we have discussed in what I sent over last. And, that you want an idea of what the stock options will look like. As I mentioned I'm reluctant to do this. However, based on what I know today this is what I am comfortable outlining to you. This requires the paperwork still to be completed which will be done in the next few months. Here is what it will look like:

2% Stock Options with a 6 month vesting upon grant.

3% Stock Options with a 4 year vesting upon grant.

Drag along provision if the company were to sell you'd automatically vest.

At this point Joe I think we can agree I've done what you asked and would like to move on. Please initial the last outline I sent you with the guaranteed amount and bonus outline and scan back. I will write it up and include this into an agreement so we can move forward. If not, it's probably best we don't proceed to HRS together.

Gavin

--
Gavin Hays
SpringBoard, Inc
623.516.8001 o
866.465.6286 t
877.890.5343 f



# Bonus Structure

## 2015

**Online EP Course:**

| | |
|---|---|
| $250.00 per completed Narrated PowerPoint. Agreed upon by RM/TH as meeting quality standard and finished on time. (78) | $19,500 opportunity |
| 30 completed by 4/22. | |
| $125 for any of the Initial 30 NOT completed by 4/22 to quality standard. | |
| No bonus for narrated PowerPoints completed by outside sources. | |
| | |
| Beta Launch | $3000 |
| Full Launch | $5000 |

**New Business Bonus:**

5% of sales price

Includes additional sales to Duke                     $10k +potential

Includes pending Swedish/Prov prospect          $50K + potential

---

Gavin Hays <ghays@springboardhealthcare.com>                              March 25, 2016 at 12:08 PM
To: Joe Giron <jcgiron@mac.com>
Re: Employee conversion

Updated contact info found in this email: Gavin Hays work: (623) 518-8001                          update... ⊙

Joe,
I'm meeting you in the middle.

GUARANTEED COMP of a minimum $250,000 providing the following obligations are met.

$175,000 (paid out $14,600 per mo.)
$20,000 (paid in the form of milestones as agreed upon for online launch less anything paid out to other experts)
$55,000 (paid out of new business development, and additional projects as assigned and completed at deadline agreed upon by team)

Bonus (10% of EP Training division profitability)

Payments continued to be made to Mission.

This is my best and final Joe.

See More from Joe Giron

--
Gavin Hays
SpringBoard, Inc
623.518.8001 o
866.465.6298 f
877.690.5343 t

# EXHIBIT 5

INDEPENDENT CONTRACTOR SERVICE AGREEMENT, CONFIDENT IALITY AGREEMENT AND
INTELLECTUAL PROPERTY ASSIGNMENT

THIS INDEPENDENT CONTRACTOR SERVICE AGREEMENT, CONFIDENTIALITY AGREEMENT
AND INTELLECTUAL PROPERTY ASSIGNMENT (the "Agreement") dated as of January 15, 2015 (the
"**EFFECTIVE DATE**"), by and between SpringBoard, Inc. (the "**COMPANY**"), an Arizona corporation with
its principal place of business in Phoenix, Arizona, and Joe Giron (the "**CONTRACTOR**"), a sole-proprietor
with offices at 5267 Renoir Lane, Chino Hills, CA 91709.

WHEREAS, CONTRACTOR will provide certain professional services to COMPANY, including, without
limitation, the services provided for in the Duke University/Duke University Health System Outside Services
Agreement attached as Exhibit A;

WHEREAS, the parties wish to confirm the confidentiality of materials possessed by COMPANY and that
COMPANY is the owner of any and all work product (and attendant intellectual property) generated or
developed by CONTRACTOR for COMPANY;

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and agreements of
the parties contained in this Agreement, the parties agree as follows:

1. SERVICES
   1.1. CONTRACTOR agrees to perform mutually agreed services (the "Services") and be compensated
   according to the schedule listed in Exhibit B, attached to this Agreement. COMPANY and
   CONTRACTOR may mutually agree on other services and compensation from time to time.
   COMPANY reserves the right to modify Exhibit B, at any time prior to assigning services to
   CONTRACTOR, provided, however, that CONTRACTOR is given notice of such modification and
   agrees to it, in writing, prior to accepting the modified assignments. CONTRACTOR will determine
   the method, details, and means of performing the Services, subject to the specifications, parameters,
   timeline and objectives set forth by COMPANY.
   1.2. CONTRACTOR may not use subcontractors to perform the Services under this Agreement without
   first receiving COMPANY's written approval, which shall not be unreasonably withheld. Contractor
   further agrees not to violate any copyright or intellectual property laws in creating the deliverables
   under this Agreement and Exhibit A.
2. COMPENSATION
   2.1. See Exhibit B, attached to this agreement. CONTRACTOR shall submit all invoices for any sums
   due within fifteen (15) days from the date of completion.
3. TERM AND TERMINATION
   3.1. This Agreement will become effective on the EFFECTIVE DATE. This Agreement will terminate on
   the completion of the Services or until terminated as set forth below.
   3.2. Either party may terminate this Agreement at any time by giving thirty (30) days written notice to the
   other party.
   3.3. Should either party default in the performance of this Agreement or materially breach any of its
   provisions, the non-breaching party may terminate this Agreement by giving written notification to
   the breaching party. Termination shall be effective immediately on receipt of the notice, or five (5)
   days from mailing of the notice, whichever occurs first. For the purposes of this section, material
   breach of this Agreement shall include but not be limited to the following:
   (a) Nonpayment of compensation by COMPANY after twenty (20) days written demand for
   payment, assuming CONTRACTOR has timely provided deliverable under this Agreement; or;
   (b) Failure of CONTRACTOR to perform the Services in a commercially reasonable manner
   and/or within a commercially reasonable time.
4. CONFIDENTIALITY
   4.1. As used herein, the term "Confidential Information" shall mean any and all information, regardless

of whether kept in a document, in an electronic storage medium, or in CONTRACTOR's memory, and includes but is not limited to all data, compilations, programs, devices, strategies, concepts, ideas, and methods concerning or related to:

    (a) Marketing and sales programs of COMPANY, the terms and conditions of sales and offers of sales of products or services by COMPANY, and strategic plans;

    (b) The terms, conditions, and current status of COMPANY's agreements and relationships with any customers, suppliers, or other entities;

    (c) Any and all work product created under Exhibit A;

    (d) The names and identities of any and all of COMPANY's customers, including any and all customer lists or similar compilations;

    (e) The know-how, computer programs, data, formulas, compositions, service techniques and protocols, and any other skills or ideas developed, accumulated, or acquired by COMPANY;

    (f) Personnel information, including the productivity and profitability (or lack thereof) of COMPANY's employees, agents, or independent contractors;

    (g) Any communications between COMPANY or its officers, directors, shareholders, or employees and any attorney retained by COMPANY for any purpose or any person retained or employed by such attorney for the purpose of assisting such attorney in his or her representation of COMPANY; and

    (h) The cost or overhead associated with the goods and services provided by COMPANY, along with COMPANY's pricing structure for its goods or services, including its margins, discounts, volume purchases, markups, or incentives.

4.2 As used herein, "Trade Secrets" includes certain Confidential Information and means, as provided in the California Uniform Trade Secrets Act (Civil Code §3426.1(d)) or Arizona Uniform Trade Secret Act, without limitation, information, including a formula, pattern, compilation, program, device, method, technique, or process that (a) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

4.2 CONTRACTOR acknowledges and agrees that COMPANY is engaged in the highly competitive business electrophysiology development, and has expended, or will expend, significant sums of money and has invested, or will invest, a substantial amount of time to develop and use, and maintain the secrecy of, the Confidential Information and Trade Secrets. COMPANY has thus obtained, or will obtain, a valuable economic asset that has enabled, or will enable, it to develop an extensive reputation and to establish long-term business relationships with its suppliers, customers, and vendors. If such Confidential Information or Trade Secrets were disclosed to another person or entity or used for the benefit of anyone other than COMPANY, COMPANY would suffer irreparable harm, loss, and damage. Accordingly, CONTRACTOR acknowledges and agrees that:

    (a) The Confidential Information and Trade Secrets are, and at all times hereafter shall remain, the sole property of COMPANY;

    (b) CONTRACTOR shall use CONTRACTOR's best efforts and utmost diligence to guard and protect Confidential Information and Trade Secrets from any unauthorized disclosure to any competitor, supplier, vendor, or customer of COMPANY or any other person, firm, corporation, or other entity except as provided for in Exhibit A;

    (c) Unless COMPANY gives CONTRACTOR prior express written permission, during CONTRACTOR's consultancy and thereafter, CONTRACTOR shall not use for CONTRACTOR's own benefit or use for or disclose to any competitor, supplier, or customer, or any other person, firm, corporation, or other entity, the Confidential Information or Trade Secrets as set forth herein;

    (d) Except in the ordinary course of COMPANY's business for COMPANY, CONTRACTOR shall not seek or accept any Confidential Information or Trade Secrets from any former, present, or future employee of COMPANY;

    (e) On demand, CONTRACTOR shall immediately return to COMPANY all documentary or tangible Confidential Information and Trade Secrets in CONTRACTOR's possession, custody, or control and shall sign an affidavit under penalty of perjury that CONTRACTOR has not made or kept any copies,

notes, abstracts, summaries, tapes, or other record of any type of Confidential Information or Trade Secrets;

(f) On demand, CONTRACTOR shall further immediately return to COMPANY any and all other COMPANY property in CONTRACTOR's possession, custody, or control, including, without limitation, keys, security cards, passes, phones, laptop computers, and marketing literature.

(g) During CONTRACTOR's consultancy, CONTRACTOR shall not disclose or use for COMPANY's behalf any Trade Secrets or confidential information of any former employer or agent, and shall make no effort to derive independently any information that is or could be a Trade Secret or confidential information of any former employer or agent. CONTRACTOR further represents and warrants that CONTRACTOR has provided to COMPANY copies of all nondisclosure, confidentiality and intellectual property assignment agreements that may bind CONTRACTOR.

(h) Following CONTRACTOR's termination for any reason, CONTRACTOR shall not directly or indirectly attempt to reconstruct any Trade Secret or Confidential Information of COMPANY through the use of COMPANY's records or CONTRACTOR's memory.

(i) After the termination of CONTRACTOR's consultancy for any reason, CONTRACTOR shall not directly or indirectly solicit the actual or potential customers of COMPANY, because the identities of such actual or potential customers has been compiled over time by COMPANY and COMPANY takes reasonable measures to protect such information and considers information regarding its actual or potential customers to be a "trade secret" as that term is defined in the Uniform Trade Secrets Act (Cal. Civil Code §§ 3426-3426.11).

5. INTELLECTUAL PROPERTY RIGHTS AND ASSIGNMENT

5.1. As used in this Agreement, the term "Inventions" shall mean and include all procedures, systems, machines, methods, processes, uses, apparatuses, compositions of matter, designs, configurations, computer programs, copyrightable material, notes, records, drawings, trade and service marks, trade dress and trade secrets of any kind, discovered, conceived, reduced to practice, developed, created, made, or produced, and any improvements to them, and shall not be limited to the meaning of the term "invention" under the United States patent laws.

5.2. CONTRACTOR agrees to disclose in writing promptly to COMPANY any and all Inventions, whether or not patentable and whether or not reduced to practice, conceived, or developed by CONTRACTOR during his or her engagement with COMPANY, either alone or jointly with others, that relate to or result from the actual or anticipated business, work, research, investigations, products, or services of COMPANY, or that result to any extent from use of COMPANY's premises or property. CONTRACTOR specifically acknowledges that CONTRACTOR was hired to invent any Inventions described in this Section 5.

5.3. CONTRACTOR acknowledges and agrees that COMPANY is the sole owner of any and all property rights in all Inventions referred to in Section 5.2 above, including, but not limited to, the right to use, sell, license, or otherwise transfer or exploit the Inventions and the right to make such changes in them and the uses thereof as COMPANY may from time to time determine

5.4. CONTRACTOR shall grant and hereby grants and assigns to COMPANY, without further consideration, CONTRACTOR's entire right, title, and interest (throughout the United States and in all foreign countries), free and clear of all liens and encumbrances, in and to all Inventions referred to in Section 5.2 above, which shall be and hereby are the sole property of COMPANY, whether or not patentable, to the fullest extent possible by law and to the fullest extent under California Labor Code §§ 2870-2872, whether or not applicable to independent contractors. A copy of California Labor Code §§ 2870-2872 is attached to this Agreement as Exhibit B.

5.5. Without limiting the generality of the foregoing, CONTRACTOR shall, at any time during or after engagement with COMPANY, at COMPANY's request, execute specific assignments in favor of COMPANY or its nominee of CONTRACTOR's interest in any of the Inventions, writings, or other works covered by this Agreement and execute all papers, render all assistance, and perform all lawful acts that COMPANY considers necessary or advisable for (a) the preparation, filing, prosecution, issuance, procurement, maintenance, or enforcement of patents, trademarks, copyrights, and other protections, and any applications for any of the foregoing, in the United States or in any foreign

country for any such Inventions, writings, or other works and (b) the transfer of any interest CONTRACTOR may have therein. CONTRACTOR hereby appoints each of the current and future officers of COMPANY as CONTRACTOR's attorney-in-fact during such time as each is an officer to COMPANY to execute documents on behalf of CONTRACTOR for this purpose.

5.6. CONTRACTOR hereby acknowledges and agrees that all writings and other works that may be copyrighted (including computer programs) and that are related to the present, planned, or reasonably anticipated business of COMPANY and are prepared by CONTRACTOR during his or her engagement with COMPANY shall be, to the extent permitted by law, deemed to be works for hire, with the copyright automatically vesting in COMPANY. To the extent that such writings and works are not works for hire, CONTRACTOR hereby waives any and all "moral rights" in such writings and works and agrees to assign, and hereby does assign, to COMPANY all of CONTRACTOR's right, title, and interest, including copyright, in such writings and works.

5.7. CONTRACTOR further agrees to reasonably cooperate with COMPANY, both during and after engagement, in obtaining and enforcing patents, copyrights, trademarks, and other protections of COMPANY's rights in and to all such Inventions, writings, and other works. CONTRACTOR shall execute any and all papers and documents required to vest title in COMPANY or its nominee in any such Inventions, writings, other works, patents, trademarks, copyrights, applications, and interests.

5.8. In the event that CONTRACTOR is not engaged by COMPANY at the time CONTRACTOR is requested to perform any act or execute any document, COMPANY shall pay to CONTRACTOR $50.00 (USD) for the execution of each such document and $50.00 (USD) per hour for each hour or portion thereof spent at the request of COMPANY in the performance of acts, plus reimbursement for any out-of-pocket expenses incurred by CONTRACTOR at COMPANY's request in such performance.

5.9. CONTRACTOR represents, warrants, and agrees that CONTRACTOR has disclosed to COMPANY all continuing obligations that CONTRACTOR has with respect to the assignment of Inventions to any previous employers, and CONTRACTOR claims no previous unpatented Inventions as his or her own, except for those that have been reduced to practice and are shown on Exhibit C attached to this Agreement. CONTRACTOR acknowledges and agrees that COMPANY does not seek the disclosure of any confidential information or Trade Secrets that CONTRACTOR may have acquired from a previous employer, and CONTRACTOR shall not disclose any such information to COMPANY and shall describe the content of Exhibit C only in generalities.

5.10.    As used in this Agreement, "Background Technology" means anything provided by CONTRACTOR to COMPANY in connection with any work done by CONTRACTOR for COMPANY that is distinct from (1) an Invention generated by, created, performed or developed by CONTRACTOR in connection with work done by CONTRACTOR for COMPANY (as defined in this Section 5), or (2) any previous invention listed on Exhibit C of this Agreement. CONTRACTOR hereby grants to COMPANY a nonexclusive, royalty-free, irrevocable, perpetual, worldwide, transferable license to make, have made, use, offer to sell, sell, import, copy, modify, create derivative works based on, distribute, sublicense (through multiple tiers), display, perform, and transmit the Background Technology, to the extent necessary to enable COMPANY to exercise all of the rights assigned to COMPANY under this Agreement. This Section 5.10 shall survive any termination of this Agreement.

6. NON-EMPLOYEE STATUS

6.1. CONTRACTOR acknowledges and agrees that this Agreement is not a contract for or guarantee of continued consultancy and that the terms and conditions of CONTRACTOR's consultancy are governed by the parties' consultancy agreement. Nothing in this Agreement is intended to afford CONTRACTOR any of the rights, duties, or obligations of an employee of COMPANY. Under no circumstances shall CONTRACTOR look to COMPANY, or any of COMPANY's principals, partners, clients, associates, supervisors, employees, directors, shareholders, agents or assigns as CONTRACTOR's employer, or as a partner, agent, or principal.

6.2. CONTRACTOR shall not be entitled to any benefits that may be accorded to COMPANY's employees including, but not limited to, worker's compensation, disability insurance, vacation or sick

pay.

6.3. It is understood by both parties that although CONTRACTOR may reside, as a tenant, on premises that are managed by COMPANY, CONTRACTOR is not doing so for the convenience of COMPANY, or for the convenience of any of COMPANY'S principals, partners, clients, associates, supervisors, employees, directors, shareholders, agents or assigns, and that CONTRACTOR has no obligation to continue their tenancy at such premises in order to provide the services described in Schedule A. CONTRACTOR further understands that CONTRACTOR may terminate his or her tenancy at any time without terminating this Agreement.

6.4. It is further understood by both parties that CONTRACTOR is not expected to perform services or to be available on an "on-call" basis for any time in excess of the time required to perform the duties described in Exhibit A.

6.5. CONTRACTOR shall be responsible for providing, at CONTRACTOR's expense, and in CONTRACTOR's name, disability, worker's compensation, liability insurance, and any other insurance as well as licenses and permits usual or necessary for performing the Services.

6.6. CONTRACTOR shall pay, when and as due, any and all taxes incurred as a result of CONTRACTOR's compensation, including estimated taxes CONTRACTOR agrees to indemnify, defend and hold harmless COMPANY and COMPANY's principals, partners, clients, associates, supervisors, employees, directors, shareholders, agents or assigns from and against any claims, losses, costs, fees, liabilities, damages or injuries suffered by CONTRACTOR, or any of CONTRACTOR's principals, partners, clients, associates, supervisors, employees, directors, shareholders, agents or assigns arising from CONTRACTOR's breach of this section, willful and/or intentional misconduct, or gross negligence.

6.7. CONTRACTOR may represent, perform services for, or be employed by any additional persons or companies as CONTRACTOR sees fit.

7. **REPRESENTATIONS AND WARRANTIES**

7.1. CONTRACTOR represents and warrants that any and all information, practices, or techniques to be described, demonstrated, divulged, or made known to COMPANY during the performance of the Services, including Background Technology, may be divulged without any obligation to, or violation of any right of, others. CONTRACTOR further represents and warrants that any and all practices or techniques that CONTRACTOR shall disclose, including Background Technology and any related materials, may be freely used by COMPANY without violation of any law or payment of any royalty, except as CONTRACTOR shall specifically identify in writing, subject to COMPANY's right to approve, in its discretion, the use of any such materials. CONTRACTOR further represents and warrants that CONTRACTOR has all rights necessary to grant the licenses to the Background Technology set forth in this Agreement.

7.2. CONTRACTOR represents that CONTRACTOR has the qualifications and ability to perform the Services in a professional manner, without the advice, control, or supervision of COMPANY. Performance of the Services in a professional manner includes meeting the requirements of the prime contract under which COMPANY is obligated to perform services for the Customer, and failure to do so shall constitute a material breach of this Agreement. CONTRACTOR shall be solely responsible for the professional performance of the Services, and shall receive no assistance, direction, or control from COMPANY. CONTRACTOR shall have sole discretion and control of CONTRACTOR's services and the manner in which performed, subject the specifications, parameters, timelines, and overall objectives set forth by COMPANY.

8. **INDEMNIFICATION**

8.1. CONTRACTOR shall indemnify, defend, and hold harmless COMPANY, its officers, directors, agents and employees, from and against any and all losses, claims, demands, suits, actions, proceedings and expenses (including reasonable attorney fees), including without limitation all acts of negligence, infringement and malfeasance, directly or indirectly arising out of or resulting from (a) any act or omission of CONTRACTOR related to services performed for COMPANY under this Agreement; (b) any unauthorized use by CONTRACTOR of Confidential Information; (c) any breach of any representation, warranty, or covenant of CONTRACTOR contained in this Agreement, or

otherwise made to COMPANY; or (d) any failure of CONTRACTOR to perform any of the representations, warranties and agreements contained in this Agreement.

9. COMPLETE AGREEMENT

    9.1. This Agreement contains the entire agreement between the parties hereto with respect to the subject matter hereof, and supersedes and cancels all previous written or oral understandings, agreements, negotiations, commitments, or any other writings or communications in respect of such subject matter.

    9.2. Although this Agreement may be updated from time to time by COMPANY, no modification, amendment or waiver of any of the provisions of this Agreement shall be effective unless in writing, specifically referring hereto, and signed by both parties.

10. SEVERABILITY

    10.1. The provisions of this Agreement shall be severable, and if any portion of this Agreement shall be held or declared to be illegal, invalid or unenforceable, such illegality, invalidity, or unenforceability shall not affect any other provision hereof, and the remainder of this Agreement, disregarding such portion, shall continue in full force and effect as though such portion had not been contained herein.

11. GOVERNING LAW

    11.1. This Agreement shall be deemed to be made in the State of Arizona, and shall be governed by and construed and interpreted in accordance with the laws of the State of Arizona. Contractor consents to venue and jurisdiction in Maricopa County, Arizona.

12. WAIVER

    12.1. The waiver by either of the parties to this Agreement of any breach of any provision hereof by the other party shall not be construed to be either a waiver of any succeeding breach of any such provision or a waiver of the provision itself.

13. HEADINGS

    13.1. The Section headings in this Agreement are inserted only as a matter of convenience, and in no way define, limit, or extend or interpret the scope of this Agreement or of any particular Section.

14. COUNTERPARTS

    14.1. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which collectively shall constitute one and the same instrument.

Executed as of the date first referenced above:

SPRINGBOARD, INC.

_____

Gavin Hays, CEO

Joe Giron/ and Mission Medical

_____

EXHIBIT A

## DUKE UNIVERSITY/DUKE UNIVERSITY HEALTH SYSTEM
## OUTSIDE SERVICES AGREEMENT

This Agreement to furnish certain contractor services is made by and between Duke University/Duke University Health System (hereinafter called "Duke") and Springboard, Inc. (hereinafter called "Contractor"). The Terms and Conditions set forth on the attached page are a part of this Agreement.

### ARTICLE I:      NATURE AND LOCATION OF SERVICE

A. Contractor shall furnish to Duke the following described services (i.e., Statement of Work):

   **See Exhibit A**

B. Individuals performing services as an Independent Contractor must complete a Duke Independent Contractor Checklist (ICC) form.  Please indicate if an ICC form has been completed.          Yes          **No**

C. If applicable, Contractor will list all active Duke Clients.

_____

_____

D. Indicate if your company is a Sole Proprietary.          Yes                    No

E. Former employees providing services similar to their previous roles or to those of other Duke University and Health System employees must be classified as employees and hence paid through the Payroll system. Individuals who are set up as sole proprietors with no former relationship with Duke must complete the Independent Contractor Checklist which will be reviewed and assessed by the appropriate Duke authorities prior to the individual providing services to Duke University or Health System. During the review process, the determination (based on Internal Revenue Service guidelines) will be made as to whether these individuals will be classified as employees or independent contractors. Links to the General Accounting Procedure: http://finance.duke.edu/accounting/gap/m200-128.php as well as the Short Term Hire Matrix: http://finance.duke.edu/procurement/procure/ap/policies/stmatrix.php are included for your reference.

F. Place(s) of performance will be:

G. Duke will provide working space, equipment, furniture, utilities and services, as follows:

H. If applicable, Contractor will assist Duke in the performance of Contract (or Grant) No._____,
   funded by_____.

### ARTICLE II:   TERM OF AGREEMENT

A. The period of performance for this Agreement shall be from January 12, 2015 through July 11, 2015.

B. Duke may terminate this Agreement at any time by giving Contractor 30 days written notice of such action.

### ARTICLE III:   COMPENSATION AND REIMBURSEMENT OF EXPENSES

A. Duke will compensate Contractor on the following basis for services performed:

   Total Fixed Price for this project is:                              $150,000

B. Payments, in accordance with the following schedule, will be made upon submission of an invoice by Contractor indicating the purchase order number and setting forth charges in accordance with rates detailed in Paragraph A above. The invoice must include the Contractor's taxpayer identification number (Social Security or Employer ID Number). Payment Terms are Net 30 days. Schedule of payment will be: Invoiced Monthly

This Agreement requires signature on Page 1 and the last page of Terms & Conditions.              Page 1 of 6 pages.

DUKE UNIVERSITY/DUKE UNIVERSITY HEALTH SYSTEM
OUTSIDE SERVICES AGREEMENT

### ARTICLE IV: NOTIFICATION

A. In performing consulting services hereunder, Contractor shall confer with Catherine McCarver.

B. Name and address of Contractor: **Springboard, Inc.**, 6970 E. Chauncey Lane St. 110, Phoenix, AZ 85054.

CONTRACTOR

Signature _____  Date 12-18-14

DUKE UNIVERSITY/
DUKE UNIVERSITY HEALTH SYSTEM

Signature - Procurement Services _____  Date 1-12-15

## DUKE UNIVERSITY/DUKE UNIVERSITY HEALTH SYSTEM
## OUTSIDE SERVICES AGREEMENT

Terms and Conditions

I. <u>Compensation</u> This compensation includes all applicable taxes, necessary permits, licenses and insurance coverage

II. <u>Assignment or Subcontracting</u> The Contractor may not assign or transfer this Agreement, or any interests therein or claim there under, nor subcontract any portion of the work, without the prior approval of Duke.

III. <u>Ownership</u> Ownership and other proprietary rights for materials produced by or for Contractor pursuant to this Agreement shall vest in Duke, except Duke shall not transfer or license all or any part of the materials produced by or for Contractor without the consent of Contractor. "Material" means writings, pictorial reproductions, drawings or other graphical representations, data and related documentation, software developments, specifications, calculations, tables, reports and documents. Contractor agrees, upon Duke's request at any time to execute assignments and other documents and to cooperate with Duke to accomplish such ownership by Duke.

IV. <u>Rights of Audit</u> For a period of three years following the completion of work performed as set forth in Article IA, Contractor shall make available, upon written request by Duke or appropriate government agent, this contract and such books, documents and records as are necessary to certify the nature and extent of cost incurred by Duke. If Contractor carries out any duties through a subcontractor that has a value and cost of $10,000 over a twelve-month period, such subcontractor shall contain a clause to the same effect.

V. <u>Conflict of Interest</u>
   a. Contractor will not hire any employee of Duke to perform any service covered by this Agreement. If the work is to be performed in connection with a federal grant or contract, Contractor will not hire any employee of the United States government to perform any services covered by this Agreement
   b. Contractor affirms that to the best of his/her knowledge there exists no actual or potential conflict of interest between Contractor's family, business or financial interests and services provided under this Agreement. In the event of change in Contractor's private interest or service under this Agreement that has potential for conflict of interest, Contractor will promptly notify Duke.
   c. Contractor agrees that the relationship between Duke and Contractor is neither an employer-employee relationship nor an agency relationship. Rather, Contractor is retained as and shall perform as an independent contractor to Duke

VI. <u>Insurance</u> Contractor will procure and maintain the following insurance:

   Commercial General Liability – $1 million each occurrence / $2 million aggregate
   Automobile Liability – $1 million each occurrence
   Workers' Compensation – Statutory Limits
   Employers' Liability – $1 million each accident
   Professional Liability – $1 million per claim

   The foregoing coverage and limits are to be considered as minimum requirements and in no way limits liability or Contractor. Duke University and Duke University Health System must be named as Additional Insured with respect to General Liability coverage insofar as it pertains to the work done or service provided. Contractor's policy must be Primary as to any other valid and collectible insurance, but only as to acts of the named insured. A certificate of insurance with the coverage as cited above must be submitted to Duke Purchasing before work begins by the Contractor for Duke.

VII. <u>Indemnity</u> Contractor agrees to indemnify and hold harmless Duke, including its trustees, officers, directors, and employees from any claim, damage, liability, injury, attorney fees, expense or loss arising out of, directly or indirectly, the Contractor's performance or nonperformance (including any subcontractors) under this Agreement.

VIII. <u>Non-Discrimination</u> Executive Order #11246, dated September 24, 1965, as amended and supplemented by Executive Order #11375, are incorporated by reference and compliance is required by the Contractor under this Agreement. Contractor agrees not to discriminate against any employee or applicant for employment because of race, age, sex, religion, color or natural origin.

   The Contractor and Subcontractor shall abide by the requirements of 41CFR 60-300.5(A) and 60-741.5(A). These regulations prohibit discrimination against qualified protected veterans and individuals on the basis of disability, and require affirmative action by covered prime Contractors and Subcontracts to employ and advance in employment qualified protected veterans and individuals with disabilities.

IX. <u>Changes</u> This Agreement may be modified, altered or changed only by an agreement in writing which has been approved by Duke's Procurement Services Department. Purchasing shall make an equitable adjustment, if appropriate, to the payment and other appropriate terms of the Agreement to accommodate such modification, alteration, or change. No payment for extras outside the scope and payment of work defined in this Agreement shall be made unless Duke's Director of Procurement Services has authorized advanced payment for such extras.

X. <u>Confidentiality</u> Contractor may be engaged in the performance of Services for Duke set forth herein and in connection therewith will be furnished or given access to knowledge, information, data, and confidential or privileged documents ("Documentation") which are confidential and proprietary to Duke. Contractor agrees that during, or at any time after the termination of the performance of Services pursuant to this Agreement, Contractor shall use such Documentation only for the purposes of performing Services under this Agreement and shall not use for itself or for any other person or business; or divulge or convey to any person or business any such Documentation.

XI. <u>Publicity</u> Contractor shall not in any way or in any form publicize or advertise in any manner the fact it is providing services to Duke without the express written approval of Duke's Senior Vice President, Public Affairs and Government Relations, obtained in advance, for each item of advertising or publicity. However, nothing herein shall preclude Contractor from listing Duke on its routine client list for matters of reference.

XII. <u>Use of Duke Name, Logos, and Trademarks</u> The Duke name and logos are the exclusive property of Duke and may only be used for approved purposes. Contractor agrees not to use any Duke Logos outside of the sole purpose indicated in this Agreement without the express written consent of Duke. Contractor may not change or alter any Duke logo in any way. Contractor is to obtain any additional approvals for the use of Duke's logos or name by contacting Procurement Services at 919-681-5900 or emailing procurement@duke.edu.

   Duke trademarks, including the Duke name and logos, may not be used in conjunction with the name or trademark(s) of any other entity without the

This Agreement requires signature on Page 1 and the last page of Terms & Conditions.                    Page 3 of 6 pages.

**DUKE UNIVERSITY/DUKE UNIVERSITY HEALTH SYSTEM**
**OUTSIDE SERVICES AGREEMENT**
prior written permission of that entity and Duke. Duke trademarks may not be used in any manner that suggests or implies Duke's endorsement of

# DUKE UNIVERSITY/DUKE UNIVERSITY HEALTH SYSTEM
## OUTSIDE SERVICES AGREEMENT

other organizations, or beliefs. Duke's trademarks may not be used in any way that discriminates or implies discrimination against any persons or groups based on age, ancestry, belief, color, creed, disability, national origin, race, religion, sex, sexual orientation, or veteran status, or in any other way that would be a violation of Duke's anti-discrimination policies or practices. No one other than Duke may claim copyright or trademark rights in or seek to register any design that uses Duke's trademarks. Approval to use a Duke trademark for a one-time application (for example, a t-shirt) does not constitute approval to use the trademark again, or in connection with any other item, or to change the design in any way, without seeking additional approval. Full information regarding University Trademark Licensing may be found at www.trademarklicensing.duke.edu, or you may contact Duke's Office of Trademark Licensing at trademarklicensing@duke.edu or 919-684-2085.

XIII.   **Identity Security**   Contractor shall take reasonable measures to protect against unauthorized access to, or use of, personal information of patients, students, employees, or customers of Duke, including individual social security numbers, as required by law, and shall give notice to Duke without unreasonable delay and in no event later than fifteen (15) calendar days after discovery of the breach. Contractor shall have in place, and provide copies to Duke upon request, information security policies and procedures to protect against unauthorized access to or use of personal information.

XIV.   **Duke Medicine Compliance Plan**   Contractor acknowledges that it has been informed that Duke Medicine has implemented a compliance program for a number of purposes including, but not limited to, ensuring that the provision of, billing for, and care at Duke Medicine is in compliance with applicable Federal and State laws ("Compliance Plan") and all Duke Medicine operations are conducted in accordance with applicable laws and regulations. Contractor acknowledges that it has received a copy of the Duke Medicine Code of Conduct. Contractor further states that 1) it has not been convicted of a criminal offense related to healthcare, 2) it is not currently under sanction, exclusion, or restriction, indictment or administrative settlement (civil or criminal) by a federal or state enforcement, regulatory, administrative, or licensing agency or otherwise ineligible for federal or state program participation, and 3) it is not currently listed on the General Service Administration List of Parties Excluded from the Federal Procurement and Non-Procurement Programs. Contractor will notify Duke Medicine in the event of any investigation, civil or criminal, of any of the above.

Contractor will notify Duke Medicine promptly of any allegation of unethical behavior, wrongdoing, or violation of Duke's policies or procedures or federal or state laws or regulations.

Duke Medicine, upon Contractor's request, shall make available such other information relating to its Compliance Program as is appropriate to assist Contractor in adhering to the policies set forth in the Code of Conduct developed as part of the Compliance Plan. Contractor is invited to attend educational sessions of Duke Medicine related to its Compliance Program. The failure of Contractor to conduct its activities in accordance with the Code of Conduct and Compliance Program shall constitute a material breach of this Agreement and Duke Medicine shall have the absolute right to terminate this Agreement immediately. Contractor agrees to verify that its employees and subcontractors meet all the requirements outlined above prior to their performing services under this Agreement.

XV.   **Governing Law** This Agreement shall be covered by the Laws of the State of North Carolina.

XVI.   **Entire Agreement** This Agreement, including all documents incorporated herein by reference, shall constitute the entire agreement between the parties and supersedes all prior agreements relating to the subject matter herein.

CONTRACTOR _Spring Board Inc_

Signature _____   Date 12-18-14

DUKE UNIVERSITY/
DUKE UNIVERSITY HEALTH SYSTEM

Signature - Procurement Services   Date 1-12-15

DUKE UNIVERSITY/DUKE UNIVERSITY HEALTH SYSTEM
OUTSIDE SERVICES AGREEMENT

Exhibit A – Statement of Work
Duke Heart Center
Springboard Electrophysiology (EP) Development Proposal

## Summary of Proposed Engagement

**PROJECT OBJECTIVE:** Assess clinical operations, facilitate development, planning, implementation and evaluation of general objectives, as dictated by initial assessments and/or administrative direction. General objectives may focus on up to six (6) core areas: (1) Administrative/Management, (2) Clinical Operations, (3) Staff Education & Training, (4) Inventory Management, (5) Staffing Resources, (6) Marketing & Recruitment. Springboard (SBI) will exercise appropriate strategic and operational recommendations that contribute to the growth and development of the program.

**DELIVERABLES:**    The EP Development Plan project will provide the following deliverables:

- Assessment of the clinical operations, with specific short & long term recommendations to address core general objectives.
- Senior EP Project Consultant (clinical & academic), six month engagement, remote oversight with periodic on site engagements.
- On site clinical EP Staff/Trainer for six-month engagement.
- IBHRE endorsed and customized EP clinical competencies.
- Custom Clinical EP Training Manual.
- Digital EP Development System – Pegasus (*Beta Pilot*).
- Professional staff development and prep for RCES credentialing.
- Optional and priority access to Springboard CCL/IR/EP allied staff and recruits.
- Option for direct hire of EP Staff/Trainer after initial engagement.

Duke shall retain non-exclusive rights in materials provided by Contractor, such as the Training Manual and Pegasus; however, Duke cannot license, transfer or disclose such materials to a third party without the prior written consent of SpringBoard.

**METHODOLOGY:**    Springboard staff will work with Duke Heart Center in the following process:

1) Conduct a Program Assessment and Operational Review.
2) Integrate EP Staff/Trainer and Senior EP Consultant into clinical operations.
3) Develop preliminary general objectives from assessments.
4) Implement strategic and operational recommendations.
5) Integrate IBHRE endorsed clinical competencies against existing staff clinical competencies.
6) Complete and employ Custom Clinical EP Training Manual with staff.
7) Complete and integrate Digital EP Development System with department.
8) Integrate prep material, lectures and resources for RCES staff education.
9) Provide summary consulting report, and execute ongoing EP development services.

**PROJECT TEAM:**    Senior EP Consultant *(clinical & academic): Joe Giron RT, RN, RCES, CEPS.*          EP
Staff/Trainer; *TBD, subject to client approval*

# EXHIBIT 6



**From: Joe Giron** jgiron@springboardstaffing.com
**Subject:** Re: Follow up
**Date:** March 18, 2015 at 4:29 PM
**To:** Gavin Hays gavin.hays@springboardstaffing.com

Hello Gavin,

Im not available Friday until 5pm if that works for you. I have finals to give at LLU, then filming at Hoag for LLU in the afternoon.

Glad to have the conversation. It will serve us well to have things set up on the front side rather then the back end. My fear is that the success of these EP endeavors will have 1,000 fathers, which will be a great problem have, if we manage it well.

Here is what I am initially thinking regarding a proposal for LLU, On-line, IP, full time, etc.

Phase IV

- Development of EP online education forum.
- Resignation form both Loma Linda University Programs (EP & CVI).
- Full Time allocation to SBI, and SBI affiliate projects.
- Net income split on EP business line as follows: 50% MMS/Joe Giron, 50% SBI.
- Stock Option = 5% undiluted shares of SBI.

Phase III

- Integrate/acquire MMS/Joe Giron Intellectual property of EP & CCL writings/development into SBI.
- Stock Option = 5% undiluted shares of SBI.

This is assuming that we do everything under one SBI corporate umbrella.

Joe

On Mar 18, 2015, at 1:55 PM, Gavin Hays <gavin.hays@springboardstaffing.com> wrote:

Joe,

Do you have some time Friday for you and I to follow up on our discussion today regarding Duke and your comments regarding IP and SpringBoard etc.? That whole dialog has given me a great deal of pause and I'd like to discuss it so you have a clear idea moving forward what the future looks like. 11:15?

--
Gavin Hays
SpringBoard, Inc
866-465-6286 p
877-890-5343 f

www.springboardstaffing.com

# EXHIBIT 7

From: Joe Giron jgiron@springboardhealthcare.com 
Subject: Re: Milestone
Date: February 5, 2016 at 6:39 PM
To: Joe Hejlik jhejlik@springboardhealthcare.com
Cc: Gavin Hays ghays@springboardhealthcare.com, Orders orders@springboardhealthcare.com, Renee Farley
rfarley@springboardhealthcare.com, Rene Gorka rgorka@springboardhealthcare.com, Ken Chamberlain
kchamberlain@springboardhealthcare.com, Rebekah Morrison rmorrison@springboardhealthcare.com, Tom Harmon
tharmon@springboardhealthcare.com, Joe Giron jcgiron@mac.com

Joe, great email. This email should actually be more of the article there anything else that needs to be
written about this project, this endeavor, everything that has and will transpire at Duke.
The vision of this project initially may have been hatched prior to meeting up with you, however you
definitely added to the vision of this project, more importantly helped to execute in a way that nobody
else could. All of those things that transpired at Duke, that you described in the email, are a direct
result of your style, and the way that you engage people, and your mastery in command of
electrophysiology from an allied professional's perspective.
A large thanks needs to go out to Greg from Duke, for buying into my crazy vision two years ago, as
well as the physicians of Duke, and more importantly Gavin's Buy in into the vision, coupled with his
planning, additions to the vision, and involved execution of the project. I asked Gavin to coach me, to
coach this project when it was still just a fragile, un-vetted vision. If working with Gavin and Joe H
wasn't enough of an A-team, Gavin then went ahead and added Rebekah, turning this team to an A+
All-Star team. With the additions of Hejlik/Morrison, I remember each time Gavin saying that there was
something greater at work here, and there clearly is. The members of this team, the passion to which
everybody executed, to the product and direction that this team/company now have in moving into a
space that does not exist, is exciting. With Tom back on with the team, shepherding, fostering, the
new ideas and directions we continue to spurn, it's going to be exciting to see what happens next,
and everyone associated with not just this project, but also Springboard as a whole.
For some, "success is a dream while others work hard at it", and that's exactly what Springboard
does, we worked hard to create success. WE do EPIC stuff!

Joe Giron
Sent from my iPhone
909-702-9992

On Feb 4, 2016, at 3:52 PM, Joe Hejlik <jhejlik@springboardhealthcare.com> wrote:

Thanks Gavin,

It's hard to believe its been over a year since I joined Springboard tasked with slowing the revolving
door of allied staff coming and going from Duke's EP lab. I remembered thinking it can't be that
bad, after all it's Duke, they were ranked 8th nationally in the country and had some top names in
the business running the EP lab. I arrived there not knowing a soul, where to park, where to change
into scrubs, or where my orientation classes were. I kept getting lost in the monstrosity of a
campus, all with the glaring eyes of a staff that wondered what the heck I was up to being there.
Springboard had put together a plan to evaluate each individual, including MD's and admin., have
them take the RCES practice test, then provide education, in the way of lectures, conferences, one
on one's, case reviews and readings to see if we could change the attitudes and generally the
culture in the lab. I will be eternally grateful for Joe Giron's hard work in getting much of the
evaluation tools ready to go and for providing moral support for a first and one of a kind project. (We
spent many a long hours putting all that together, working late nights before Joe would leave back to
CA.) In the mean time I knew I needed to get to know each of the lab's allied staff persons, MD's,
practitioners and memorize their names, and get them to trust me, no small task when most folks
thought I was worse then a JCAHO rep. and avoided me like the plague!! Eventually guards were
lowered and folks realized I was there to help. Once that happened most staff let me come into their
work lives and opened their brains to learning. I like to say at first they "didn't know what they didn't
know" but after starting the education realized "they now started knowing what they never realized
they had to know" and it scared many of them big time. Eventually the competitiveness and
"wanting to learn" led to a change in the attitudes and once admin. and the MD's started seeing this

change, the whole project morphed into a healthy, productive environment.  Any bad language, drama, or bad attitudes quickly became the minority and the health of the lab continued to move in a positive direction.  Eventually the supervisor of the lab left, and was replaced with a very positive member of the allied group, who after being in the trenches with the rest, knew what was needed and the positive culture continued.  Today they are running a 4th lab, without any additional hires, after struggling to run 3 labs with an inept group 9 months ago.  The supervisor rolls up her sleeves and jumps in to help whenever she can and the staff admire and love her for it.  The MD's are now happy to answer questions  where in the past the questions didn't make sense and frustrations ran high.  A mentorship committee was established, with the idea of continued learning by their most advanced staff, and to leave more competitiveness of others who want to be on that committee.  Duke applied for the Baldridge award, an award for innovative design improving the scope of healthcare and although they were runner-up, for this award, it added to the pride level they were experiencing.  There are too many milestones and accomplishments by the Duke staff to mention but hopefully soon many will be RCES credentialed.  The Savant just released was the last component of leaving the Duke group with a tool for continued success.  Joe Giron deserves a huge thank-you for his tireless work and foresight into this project.  Rebekah Morrison, Tom Harmon and Gavin, were all needed to make it to the finish line.  So good job everyone!  Was quite a ride!!  Joe H.


Joe Hejlik RN BSN RCES
EP - Clinical Educator
SpringBoard
jhejlik@springboardhealthcare.com

<image005.jpg>

On Feb 4, 2016, at 2:02 PM, Gavin Hays <ghays@springboardhealthcare.com> wrote:

I wanted to take a minute to let everyone know that today SpringBoard delivered the first version of our customized tablet based RCES training curriculum to Duke University Medical Center's Electrophysiology Department. Until know it's been in a beta phase, but today Joe Giron, RN, RCES, IBHRE, RT(T) is on site at Duke training their Allied Health mentor committee on the tablet. There is over 600 PAGES!! of content, with proprietary images and more created by SpringBoard. it will be used by a department of about 25 employees to improve their competency and ultimately patient care. I am so proud. As a company this is a monumental step in our march to be the leader in cardiovascular talent services, and education. There is no other product like this that exists on the planet. We are breaking new ground and now have the attention of one of the leading cardiovascular programs in the world. This would not be possible without the dedicated effort put forth by some of our team members that many of us don't see day to day. I want to give a youuuuuuuuge thank you and pat on the back to Joe Giron, Joe Hejlik, Rebekah Morrison and Tom Harmon. This wouldn't be possible without you guys. We are all grateful for your hard work. This is going to open doors for us that we haven't even thought possible. We are all very lucky to have you as colleagues.

Here we grow again!

Gavin

--
Gavin Hays
SpringBoard, Inc
623.516.8001 o
866.465.6286 t
877.890.5343 f



# EXHIBIT 8

SpringBoard

October 28, 2016

Joe Giron
5267 Renior Lane
Chino Hills, California 91709

Dear Joe:

I am happy to advise you that you have been selected by the Board of Directors (the "**Board**") administering the 2009 Stock Incentive Plan (the "**Plan**") of SpringBoard, Inc. (the "**Company**"), to receive non-qualified stock options and that on October 12, 2016 (your "Grant Date") you were granted options to purchase One Thousand (1000) shares of the Company's Series B Common Stock (no par value) which stock is non-voting (the "**Stock**"), at a price of six dollars and 780017/100 ($6.780017) per share. The option granted to you is subject to the terms and conditions of the Plan and those additional terms and conditions are set forth in this Award Agreement (the "**Agreement**"). The terms of the Plan are incorporated by reference in this Agreement and govern the granting, holding and exercise of your option as though set forth in full in this letter. A copy of the Plan is attached as <u>Exhibit A</u> for your review. All capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings assigned thereto in the Plan.

The Board has imposed the following additional terms and conditions relating to your option and its exercise:

1.      You may exercise your option, only in accordance with Paragraph 3 below, by delivery to the Company (in care of its Secretary) at the principal offices of the Company, presently located at 6910 East Chauncey Ln, Phoenix, Arizona 85054, written, irrevocable notice of exercise in the form attached to this letter as <u>Exhibit B</u>, specifying the number of shares with respect to which the option is being exercised, together with payment of the exercise price for those shares in cash or by check. Any other form of exercise or tender may be refused by the Company, acting through the Board or otherwise, in its discretion.

2.      Except as provided in the Plan, your option is not transferable other than by Will and is exercisable, during your lifetime, only by you. You may not assign or otherwise transfer or encumber your option or any interest in your option to any person in any way.

3.      (a) Provided you are complying with the provisions of your Independent Contractor Agreement dated January 15, 2015 ("Independent Contractor Agreement"), specifically provisions 4, 5, 7, and 8, and subject to the further provisions of this Paragraph 3 and the Plan, your option shall first vest and become exercisable with respect to the shares subject to your option on the dates set forth below (the "Vesting Dates"), and not before, with respect to the designated number of shares as follows:

200 shares will vest on October 12, 2017, which is the first anniversary of your Grant Date.  Thereafter, your option will vest on each succeeding anniversary of that date, for the next four (4) years, at a rate of 200 shares per year.

Notwithstanding any other provision of this Agreement (other than Paragraph 3(f) below), your option, to the extent not previously exercise, shall automatically terminate and be of no further force or effect on and as of 5:00 o'clock p.m., M.S.T., of the date which is the tenth (10th) anniversary of your Grant Date, unless terminated earlier as provided in the Plan.

(b)      In the event of your death prior to any Vesting Date, your unexpired option shall automatically terminate to the extent it has not vested pursuant to Paragraph 3(a) above or Paragraph 3(f) below, and your rights with respect to the option to the extent it has vested shall be governed by the Plan and Paragraphs 3(c) and 3(g) below.

(c)      In the event you violate your Independent Contractor Agreement dated January 15, 2015, specifically provisions 4, or 5, the Company shall have the right (but not the obligation) to purchase any shares of Stock held by you (including shares acquired pursuant to Section 6.3 of the Plan).  Through your signature below, you expressly acknowledge that this provision includes any Stock held in the Company, regardless of whether that Stock was acquired through the Plan or otherwise.  The purchase price for your Stock shall be the lower of the exercise price you paid for that Stock or the Fair Market Value per share of the Stock as of the Termination Date, as defined in the Plan.

(i)      The Company (or its nominee) shall exercise this right to repurchase the shares of Stock, if at all, within six (6) months following the date of notice of your violation of your Independent Contractor Agreement by delivering written notice of exercise to you or your personal representative. From and after the delivery of the written notice of exercise by the Company, you will no longer be a shareholder of the Company for any purposes.  Payment will be made in accordance with Paragraph (ii) below.

(ii)      Payment of the exercise price by the Company shall be made by an initial payment on the Initial Payment Date (defined below) equal to 20% of the purchase price, and the balance shall be made in four (4) equal annual installments of principal and accrued interest commencing on the first anniversary of the Initial Payment Date.  Interest shall commence to accrue from the date of the exercise notice at the prime rate of interest in effect on the Initial Payment Date as announced in the Wall Street Journal (or a reasonable substitute selected by the Board), and it shall be adjusted annually thereafter to

2

the then-existing Wall Street Journal-announced prime rate (or a reasonable substitute selected by the Board), which adjusted rate of interest shall remain in effect for the entire year then beginning (interim changes in the prime rate during the year being disregarded). The **"Initial Payment Date"** for purposes of this Paragraph shall be the sixtieth (60th) day following delivery of the Company's notice of exercise. The Company may, at its election, prepay amounts due under this Paragraph, without premium or penalty. You will surrender all stock certificates to the Company promptly upon request.

(d)    In the event any shares of Stock acquired pursuant to exercise of options hereunder, or any interest therein, are to be transferred, voluntarily or involuntarily (including, without limitation, any sale, encumbrance, foreclosure or transfer in lieu thereof, or by operation of law, any division of marital property on account of divorce or legal separation being deemed a "transfer" for purposes hereof, but excluding transfers to which Paragraph 3(c) hereof applies), the Company (or its nominee) shall have a right of first refusal as follows:

(i)    You (or the holder of such shares if not you) shall give the Company advance written notice detailing all the terms of the proposed transfer. The Company (or its nominee) shall have the right (but not the obligation), exercisable upon delivery to the transferring shareholder of written notice of acceptance within thirty (30) days following receipt of the notice of proposed transfer described in the preceding sentence, to repurchase all or any of those shares on the terms and conditions set forth in the notice;

provided that the per share purchase price shall be the lesser of (X) the price or (Y) the Fair Market Value of the shares (and shall be the Fair Market Value in the event of a transfer not involving any consideration); and

provided further that the purchase price shall be payable, at the election of the Company (or its nominee), either on the terms set forth in the transferor's notice or in installments with interest as set forth in Paragraph 3(c)(ii). The Company may, at its election, prepay amounts due under this Paragraph, without premium or penalty.

(ii)    The date of consummating the purchase shall be the sixtieth (60th) day following delivery of the Company's (or its nominee's) notice of exercise. Failure by the Company (or its nominee) (without default by the transferring shareholder) to close the purchase within the above 60-day period shall give the transferring shareholder the right to transfer the shares or interest therein on the terms and to the person described in the notice during the 60 days following

3

expiration of the original 60-day period; provided that the shares or interest therein to be transferred shall for all purposes remain subject to this Agreement. If the transferring shareholder fails to close the proposed transfer on those terms within that second 60-day period, the proposed transfer shall again be subject to the terms of this Paragraph 3(d).  Notwithstanding the foregoing, the shares may be transferred or retransferred without invoking this right of first refusal between you and trusts of which you and/or your spouse are the sole beneficiaries by giving prior written notice certifying that such a transfer is to be made; provided that following that transfer, those shares shall remain subject to this right of first refusal and all the other provisions of this Agreement.

(e)     Until the Company affirmatively elects to no longer be treated as an S corporation under Subchapter S of the Code, to the extent the effect of any transfer of any shares of Stock or interest therein would be to disqualify the Corporation from treatment as an S corporation under the requirements of Subchapter S of the Code, as from time to time amended (including without limitation those requirements contained in current Section 1361 of the Code), that provision or action shall be void and of no effect. So long as the Company's right to repurchase the Stock as set forth in this Paragraph 3 remains effective, neither you, nor your personal representative(s), devisee(s), heir(s), successor(s), or assignee(s) shall sell, assign or otherwise transfer any shares of Stock or interest therein without obtaining the written agreement of the purchaser, assignee or transferee that the shares remain subject to this repurchase right, and you agree that certificates evidencing the Stock may be legended to reflect the foregoing restrictions.

(f)     In its sole discretion, the Board may waive or accelerate vesting of options, or waive or extend expiration dates.

(g)     If at any time within 2 years after your Grant Date you engage in any activity which is prohibited by any agreement executed by you in connection with your engagement to provide services with the Company, including without limitation any non-disclosure and restrictive covenant agreements between you and the Company, then,

(i)     this option shall terminate effective the date on which you enter into that activity, unless terminated sooner by operation of another term or condition of this Agreement, and

(ii)     any option gain realized by you from exercising all or a portion of this option shall be immediately payable by you to the Company on the date on which you entered into that activity.

The Company shall have the right to set off any amount owed to you by the Company against any amounts you owe to the Company under this Paragraph 3(g).

4

6910 E. Chauncey Lane, #120, Phoenix, AZ 85054
623.516.8001

(h)     Paragraph 3(d) shall terminate and be of no further force and effect automatically upon the closing of an initial public stock offering of the Company's common stock under the Securities Act the result of which is that the Company's common stock is traded, or quoted, as applicable, on a national securities exchange, over the counter on NASDAQ, or through the National Market System.

4.     The Company will reserve or keep available at all times sufficient shares of its common stock to permit the exercise of your option and all other options granted or to be granted under the Plan.

5.     It is contemplated that the common stock in the Company to be issued to you upon exercise of your option will not be registered under the Securities Act of 1933, as amended (the "Act") or any applicable state securities laws, in reliance on exemptions from registration thereunder.  If in the opinion of counsel satisfactory to the Company no exemption from registration is then available, or if the issuance is otherwise in violation of applicable law at the time purchase rights are exercised under this option, then the Company's obligation to issue shares of its common stock upon exercise of your option shall be suspended until the time as the Company's counsel determines that an exemption from registration is available and the shares can be issued without violation of law.  If an exemption is available in the opinion of that counsel, and the issuance is not otherwise in violation of applicable law, you (or your personal representative(s), devisee(s), or heir(s)) will deliver to the Company as a condition precedent to giving notice of each exercise, an investment letter agreement in form and substance satisfactory to the Company to enable the Company to comply with the Act or other applicable securities laws and which may, among other things, limit or condition the right to dispose of shares acquired under your option.  Dispositions of the shares of Stock acquired by exercise of your option will be permitted only if in the opinion of counsel satisfactory to the Company that disposition is not in violation of this Agreement, the Act, any applicable state securities laws, or any other applicable law, and you (or your personal representative(s), devisee(s), or heirs(s)) deliver to the Company a letter agreement in form and substance satisfactory to the Company whereby your successor(s) or assign(s) agrees to be bound by the terms and conditions of this Agreement.  You (and your personal representative(s), devisee(s), or heir(s)) agree to pay all costs of obtaining any legal opinions and all costs in connection with proposed exercise of your option or dispositions of shares acquired pursuant to your option.

6.     You agree to pay to the Company or to make arrangements satisfactory to the Board to pay to the Company, at the time as any income is recognized by you with respect to this option, any Federal, state, or local taxes of any kind required by law to be withheld on that income by the Company.  In the event of a disposition or other transfer

5

by you of common stock issued to you upon exercise of your options, you agree to provide the Company promptly written notice describing in reasonable detail the disposition or transfer, including without limitation the sale price, if any, and date of transfer or dispositions.

7.    The Board may effect certain amendments to the Plan (within the limitations prescribed by the Plan) and the Board has the ultimate and conclusive authority to interpret and administer the Plan and options (including this option) granted under it.

8.    The Plan and this option granted to you thereunder are governed by, and shall be interpreted according to, the laws of the State of Arizona without giving effect to the principles of conflicts of laws.

9.    Each party hereto agrees to do all such things and take all actions, and to make, execute and deliver other documents and instruments, as shall be reasonably requested to carry out the provisions, intent and purpose of this Agreement.

**10.    Because the tax, financial, legal and accounting effects may vary depending on your personal circumstances, and the laws may change from time to time, it is strongly recommended that you consult with tax, legal, financial, accounting and other advisors to determine the impacts on you associated with this option.**

**This Agreement only grants the options described above and is not any promise to issue future Awards to you under the Plan. Neither does it constitute an employment agreement or a promise or assurance of employment for any period of time, including any period of time necessary to permit full vesting or exercise of the options under Paragraph 1 above.**

**You acknowledge and agree that the Company has affirmatively elected to be treated as an S corporation under Subchapter S of the Code. Upon exercise of your option you will hold shares of non-voting Series B Common Stock, and will be allocated on a pro rata daily basis your share of the Company's income and loss items. This may result in additional income tax liability to you, and the Company is under no obligation to make distributions to you that would offset any tax liability and that taxes will be due regardless of whether you receive any cash distributions on that income from the Company. The decision on whether to make distributions, and the amount of those distributions (which will be shared on a pro rata basis amongst all stockholders), will be made by the Board of Directors or the holders of a majority of the Company's outstanding voting stock.**

6910 E. Chauncey Lane, #120, Phoenix, AZ 85054
623.516.8001

Please acknowledge your receipt of this Agreement, together with the materials referred to herein, and your agreement to the terms and conditions of your option as set forth herein and in the Plan, by signing the enclosed copy of this letter and returning it promptly to the Secretary of the Company at the address set forth in Section 1 of this letter.  Any questions concerning any matter relating to your stock option or the Plan should also be addressed to the Secretary.

Very truly yours,

SPRINGBOARD, INC.

By_____
Name: Gavin Hays
Title:  _CEO_____

ACCEPTED AND AGREED:

_____
Joe Giron

The undersigned, as spouse of the grantee hereby confirms that community property of grantee and the undersigned is subject to and bound by the agreement set forth above:

_____
Print Name:_____

7

SpringBoard

EXHIBIT A

[Attach Plan]

SpringBoard

EXHIBIT B

NOTICE OF EXERCISE OF OPTION TO PURCHASE SHARES OF
SPRINGBOARD, INC. AND RECORD OF STOCK TRANSFER

I hereby exercise my Non-Qualified Stock Option granted by SpringBoard, Inc. under its 2009 Stock Incentive Plan (the "**Plan**") subject to all the terms and provisions referred to in the Plan, and notify you of my desire to purchase _____ shares of Common Stock of SpringBoard, Inc. (the "**Company**") which were offered to me pursuant to that Option.  Enclosed is my check in the sum of $_____ in full payment of those shares.  I also agree to provide a check for the taxes due on that award, or to otherwise make arrangements satisfactory to the Company for the payment of those taxes promptly following notification to me of the taxes due upon this exercise.

I hereby represent that the _____ shares of the Company's Common Stock to be delivered to me pursuant to the above-mentioned exercise of the Option granted to me on _____ are being acquired by me as an investment and not with a view to, or for sale in connection with, the distribution of any such shares.  I also represent that I have read and fully understand the Plan and the Agreement, including without limitation the restrictions on transfer of the shares hereby being acquired and the Company's repurchase rights with respect to those shares.  Through my signature below, I expressly acknowledge that this Agreements permits the Company to repurchase any Stock I hold in the Company, regardless of whether those shares were acquired through the Plan or otherwise.   I agree to indemnify the Company and its subsidiaries, together with their respective officers and directors, against any and all liabilities, losses, damages and expenses (including reasonable attorney fees) arising from or in connection with any disposition of the shares hereby being acquired, or any interest therein, in violation of applicable securities laws or regulations.

**I acknowledge and agree that (a) the Company has affirmatively elected to be treated as an S corporation under Subchapter S of the Code, (b) upon exercise of this Option I will hold shares of non-voting Series B Common Stock, and will be allocated on a pro rata daily basis my share of the Company's income and loss items, which may result in additional income tax liability, (c) the Company is under no obligation to make distributions to me that would offset any tax liability and that taxes will be owed by me regardless of whether I receive any cash distributions, and (d) the decision on whether to make distributions, and the amount of such distributions (which will be shared on a pro rata basis amongst all stockholders), will be made by the Board of Directors or the holders of a majority of the Company's outstanding voting stock.**

Dated: _____.


_____

Gregory B. Collins (#023158)
Seth T. Goertz (#031645)
KERCSMAR & FELTUS PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
Telephone: (480) 421-1001
Facsimile:  (480) 421-1002
gbc@kflawaz.com
stg@kflawaz.com

ORIGINAL

Attorneys for Plaintiffs Joseph A. Giron and
Mission Medical Services, Inc.

## IN THE SUPERIOR COURT FOR THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| JOSEPH A GIRON, a married man; MISSION MEDICAL SERVICES, INC., a California corporation, | Case No. CV2017-013928 |
| Plaintiffs, | **SUMMONS** |
| v. | If you would like legal advice from a lawyer, Contact the Lawyer Referral Service at 602-257-4434 or www.maricopalawyers.org Sponsored by the Maricopa County Bar Association |
| SPRINGBOARD, INC, an Arizona corporation; SPRINGBOARD HEALTHCARE GROUP, LLC and GAVIN HAYS, an unmarried man, | |
| Defendants. | |

### THE STATE OF ARIZONA TO:

Gavin Hays
6910 E. Chauncey Lane
Suite 120
Phoenix, AZ 85054

    YOU ARE HEREBY SUMMONED and required to appear and defend in the above-entitled action in the above-entitled Court within 20 days, exclusive of the date of service, after service of this Summons upon you if served within the State of Arizona; or within 30 days, exclusive if the date of service, if served without the State of Arizona, and you are

*Kercsmar & Feltus PLLC*
*7150 East Camelback Road, Suite 285*
*Scottsdale, Arizona 85251*
*(480) 421-1001*

hereby notified that in case you fail to so do, judgment by default may be entered against you for the relief demanded in the Complaint.

Requests for reasonable accommodation for persons with disabilities must be made to the division assigned to the case by parties at least 3 judicial days in advance of a scheduled court proceeding.

The name and address of Plaintiff's attorney are:

Gregory Collins
Seth Goertz
KERCSMAR & FELTUS PLLC
7150 E. Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001 (tel)
(480) 421-1002 (fax)
gbc@kflawaz.com
stg@kflawaz.com

GIVEN UNDER MY HAND and seal of the above-referenced Court of Arizona, Maricopa County this _____ day of _____ 2017.

OCT 3 0 2017

MICHAEL K. JEANES, CLERK
MARICOPA COUNTY SUPERIOR COURT



By: _____
Deputy Clerk

R. Mallard
Deputy Clerk

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2

1   Gregory B. Collins (#023158)
    Seth T. Goertz (#031645)
2   KERCSMAR & FELTUS PLLC
3   7150 East Camelback Road, Suite 285
    Scottsdale, Arizona 85251
4   Telephone: (480) 421-1001
    Facsimile:  (480) 421-1002
5   gbc@kflawaz.com
6   stg@kflawaz.com

    ORIGINAL

7   Attorneys for Plaintiffs Joseph A. Giron and
8   Mission Medical Services, Inc.

9         **IN THE SUPERIOR COURT FOR THE STATE OF ARIZONA**

10           **IN AND FOR THE COUNTY OF MARICOPA**

11  JOSEPH A GIRON, a married man;          Case No.
12  MISSION MEDICAL SERVICES, INC., a                    CV2017-013928
    California corporation,
13                                          **SUMMONS**
    Plaintiffs,
14
                                           If you would like legal advice from a lawyer,
15  v.                                     Contact the Lawyer Referral Service at
                                                      602-257-4434
16  SPRINGBOARD, INC, an Arizona                           or
    corporation; SPRINGBOARD                    www.maricopalawyers.org
17  HEALTHCARE GROUP, LLC and GAVIN             Sponsored by the
    HAYS, an unmarried man,                 Maricopa County Bar Association
18
19
                    Defendants.
20
21      **THE STATE OF ARIZONA TO:**

22      Springboard Healthcare Group, LLC
        c/o Gavin Hays
23      6910 E. Chauncey Lane
        Suite 120
24      Phoenix, AZ 85054
25
26      YOU ARE HEREBY SUMMONED and required to appear and defend in the above-
27  entitled action in the above-entitled Court within 20 days, exclusive of the date of service,
28  after service of this Summons upon you if served within the State of Arizona; or within 30

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

days, exclusive if the date of service, if served without the State of Arizona, and you are hereby notified that in case you fail to so do, judgment by default may be entered against you for the relief demanded in the Complaint.

Requests for reasonable accommodation for persons with disabilities must be made to the division assigned to the case by parties at least 3 judicial days in advance of a scheduled court proceeding.

The name and address of Plaintiff's attorney are:

Gregory Collins
Seth Goertz
KERCSMAR & FELTUS PLLC
7150 E. Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001 (tel)
(480) 421-1002 (fax)
gbc@kflawaz.com
stg@kflawaz.com

GIVEN UNDER MY HAND and seal of the above-referenced Court of Arizona, Maricopa County this _____ day of _____ OCT 3 0 2017 _____ 2017.



MICHAEL K. JEANES, CLERK
MICHAEL K. JEANES, CLERK
MARICOPA COUNTY SUPERIOR COURT

By: _____
Deputy Clerk

R. Mallard
Deputy Clerk

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2

1  Gregory B. Collins (#023158)
2  Seth T. Goertz (#031645)
   KERCSMAR & FELTUS PLLC
3  7150 East Camelback Road, Suite 285
   Scottsdale, Arizona 85251
4  Telephone: (480) 421-1001
   Facsimile:  (480) 421-1002
5  gbc@kflawaz.com
6  stg@kflawaz.com

7  Attorneys for Plaintiffs Joseph A. Giron and
   Mission Medical Services, Inc.
8

ORIGINAL

9        IN THE SUPERIOR COURT FOR THE STATE OF ARIZONA

10            IN AND FOR THE COUNTY OF MARICOPA

11  JOSEPH A GIRON, a married man;          Case No.  CV2017-013928
12  MISSION MEDICAL SERVICES, INC., a
    California corporation,
13                                          SUMMONS
    Plaintiffs,
14
    v.                                      If you would like legal advice from a lawyer,
15                                          Contact the Lawyer Referral Service at
    SPRINGBOARD, INC, an Arizona                           602-257-4434
16  corporation; SPRINGBOARD                                    or
    HEALTHCARE GROUP, LLC and GAVIN                  www.maricopalawyers.org
17  HAYS, an unmarried man,                              Sponsored by the
18                                               Maricopa County Bar Association

19
                   Defendants.
20

21      THE STATE OF ARIZONA TO:

22      Springboard, Inc.
        c/o Gavin Hays
23      6910 E. Chauncey Lane
        Suite 120
24      Phoenix, AZ 85054
25

26      YOU ARE HEREBY SUMMONED and required to appear and defend in the above-
27  entitled action in the above-entitled Court within 20 days, exclusive of the date of service,
28  after service of this Summons upon you if served within the State of Arizona; or within 30

*Kercsmar & Feltus PLLC*
*7150 East Camelback Road, Suite 285*
*Scottsdale, Arizona 85251*
*(480) 421-1001*

1   days, exclusive if the date of service, if served without the State of Arizona, and you are
2   hereby notified that in case you fail to so do, judgment by default may be entered against
    you for the relief demanded in the Complaint.

3       Requests for reasonable accommodation for persons with disabilities must be made to
4   the division assigned to the case by parties at least 3 judicial days in advance of a
5   scheduled court proceeding.

6
7       The name and address of Plaintiff's attorney are:

8                       Gregory Collins
                           Seth Goertz
9                   KERCSMAR & FELTUS PLLC
10              7150 E. Camelback Road, Suite 285
                   Scottsdale, Arizona 85251
11                     (480) 421-1001 (tel)
                       (480) 421-1002 (fax)
12                     gbc@kflawaz.com
13                     stg@kflawaz.com

14
15  GIVEN UNDER MY HAND and seal of the above-referenced Court of Arizona, Maricopa
16  County this _____ day of _____2017.

17                          OCT 3 0 2017

18                  MICHAEL K. JEANES, CLERK
19                  MARICOPA COUNTY SUPERIOR COURT
20
21                  MICHAEL K. JEANES, CLERK
                            By:
22                          Deputy Clerk
23                                          R. Mallard
                                            Deputy Clerk
24
25
26
27
28

2

Kercsmar & Feltus PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
(480) 421-1001

MICHAEL K. JEANES, CLERK
BY *R. Mallard* DEP

R. MALLARD, FILED

17 OCT 30 PM 4: 53

Gregory B. Collins (#023158)
Seth T. Goertz (#031645)
KERCSMAR & FELTUS PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
Telephone: (480) 421-1001
Facsimile: (480) 421-1002
gbc@kflawaz.com
stg@kflawaz.com

*Attorneys for Plaintiffs Joseph A. Giron and*
*Mission Medical Services, Inc.*

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| JOSEPH A GIRON, a married man; MISSION MEDICAL SERVICES, INC., a California corporation, | Case No. CV 2017-013928 |
| Plaintiffs, | **CERTIFICATE OF COMPULSORY ARBITRATION** |
| v. | |
| SPRINGBOARD, INC, an Arizona corporation; SPRINGBOARD HEALTHCARE GROUP, LLC and GAVIN HAYS, an unmarried man, | |
| Defendants. | |

Undersigned counsel certifies that she knows the dollar limits and any other limitations set forth by the local rules of practice for the applicable superior court, and further certifies that this action is not subject to compulsory arbitration, as provided in Rules 72 through 77 of the Arizona Rules of Civil Procedure.

DATED this 30th day of October, 2017.

KERCSMAR & FELTUS PLLC

By _____
Gregory Collins
Seth Goertz
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
*Attorneys for Plaintiff*

*Kercsmar & Feltus PLLC*
*7150 East Camelback Road, Suite 285*
*Scottsdale, Arizona 85251*
*(480) 421-1001*

1